Angelo MEDURE, Plaintiff,

v.

THE VINDICATOR PRINTING CO. and Cory Armstrong, Defendants.

No. 98–1914.

United States District Court, W.D. Pennsylvania.

Nov. 22, 2002.

Richard DiSalle, Rose, Schmidt, Hasley & Disalle, P.C., Pittsburgh, PA, for Plaintiff.

David L. Marburger, Baker & Hostetler, LLP, Cleveland, OH, Scott E. Henderson, Thorp, Reed & Armstrong, LLP, Pittsburgh, PA, for Defendants.

## MEMORANDUM

STANDISH, District Judge.

### I

In this civil action, plaintiff, Angelo Medure (Medure), seeks damages for defamation from defendants, The Vindicator Printing Company and Cory Armstrong (Armstrong).[1] Presently, before the court are the parties' objections to the Amended Report and Recommendation of Magistrate Judge Ila Jeanne Sensenich (Magistrate Judge Sensenich) with respect to defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, Magistrate Judge Sensenich's Amended Report and Recommendation will be adopted in part and overruled in part, and judgment will be entered in defendants' favor as a matter of law.

### II

Medure owns Gaming World International, Inc. (Gaming World), a company which was engaged in the business of developing and managing casinos on Indian reservations. In early 1992, Gaming World entered into a five-year contract to manage the Shooting Star Casino for the White Earth Band of Chippewa Indians (White Earth Band) in Mahnomen, Minnesota. This defamation action arises out of the November 13, 1997 publication of an article by Armstrong, who was a reporter for *The Vindicator,* a daily newspaper based in Youngstown, Ohio.[2] In the article, Armstrong stated that the White Earth Band had terminated its contract with Gaming World in August, 1996, and that Gaming World had been "placed under FBI investigation on allegations of skimming $22 million from the casino."

In Count One of the complaint, Medure and Gaming World alleged that Armstrong's November 13, 1997 article was defamatory because it imputed criminal activity to them. In Count Two, Medure and Gaming World alleged that neither Medure nor Gaming World was a public figure or involved in a public controversy, and that defendants' conduct was malicious, wanton, willful, reckless, intentional and outrageous. Therefore, Medure and Gaming World requested an award of punitive damages.

When the action was removed by defendants from the Court of Common Pleas of Lawrence County, Pennsylvania to this court on November 17, 1998, it was referred to Magistrate Judge Sensenich for pretrial procedures. Based on a stipulation of the parties, all claims asserted against defendants by Gaming World, as well as all claims asserted by Medure for economic injuries, were dismissed on October 19, 1999. Thereafter, on January 31, 2000, defendants filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56.

On August 28, 2000, Magistrate Judge Sensenich filed a Report and Recommendation with respect to defendants' motion for summary judgment, recom-

---

1. This action was initiated by Medure and Gaming World International, Inc., in the Court of Common Pleas of Lawrence County, Pennsylvania, on October 19, 1998. Defendants removed the action to this court on November 17, 1998, based on diversity jurisdiction.

2. Defendant The Vindicator Printing Company, an Ohio corporation, publishes *The Vindicator.*

mending that the motion be denied. In summary, Magistrate Judge Sensenich recommended that the court make the following findings: (1) that Medure should not be deemed a limited purpose public figure for purposes of his defamation claim against defendants;[3] (2) that, because Medure is a private figure in this case, defendants have the burden of proving that the statement in Armstrong's November 13, 1997 article regarding an FBI investigation was true,[4] which cannot be decided by summary judgment; (3) that Pennsylvania law applies to Medure's defamation claim; (4) that defendants failed to demonstrate that the statement in Armstrong's November 13, 1997 article regarding an FBI investigation was substantially true; (5) that, with respect to defendants' argument that the challenged statement in Armstrong's November 13, 1997 article is protected by the "fair report" privilege, plaintiff has demonstrated the existence of a material fact as to whether defendants abused this privilege, precluding summary judgment in defendants' favor on this ground; (6) that the alleged defamatory statement in Armstrong's November 13, 1997 article is not protected by the "wire service" privilege pursuant to which republication of a news article published by a recognizable and reliable source of daily news cannot constitute defamation, unless the story was re-

produced in a negligent manner; and (7) that the issue of whether the statement in question was "of and concerning" Medure is a question of fact for the jury.

Defendants filed objections to Magistrate Judge Sensenich's Report and Recommendation, and, after considering the memoranda and exhibits and depositions submitted in support of, and in opposition to, defendants' objections, Magistrate Judge Sensenich filed an Amended Report and Recommendation on December 1, 2000. Again, Magistrate Judge Sensenich recommended that defendants' motion for summary judgment be denied. However, Magistrate Judge Sensenich made several substantial substantive changes to her original Report and Recommendation. Specifically, in the Amended Report and Recommendation, Magistrate Judge Sensenich recommended the court find that (1) although the court was not bound by a decision of the Honorable Maurice B. Cohill, Jr. in a prior defamation case against different defendants that Medure was a limited purpose public figure, Medure should be deemed a public figure for purposes of a public controversy in this case based on, *inter alia*, the reasoning of Judge Cohill in that case (*see Medure v. The New York Times Co.*, 60 F.Supp.2d 477 (W.D.Pa.1999));[5] (2) based on Me-

---

**3.** The distinction between a plaintiff's status as a public or private figure is significant in a defamation case because a public figure plaintiff has to prove by clear and convincing evidence that the defendant acted with actual malice, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), while a private figure plaintiff allegedly defamed in speech of a private concern need only demonstrate simple fault on the part of the defendant to recover damages, including punitive damages. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 764, 774, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). Based on Magistrate Judge Sensenich's recommendation that Medure not be deemed a limited purpose public

figure in this case, she declined to consider defendants' argument that Medure has failed to produce clear and convincing evidence that they acted with actual malice, which would entitle defendants to summary judgment.

**4.** In contrast, a public figure plaintiff in a defamation case has the burden of proving that the statement at issue is false. *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996).

**5.** Medure's defamation action against The New York Times Company and its subsidiary, The Press Democrat, arose out of two newspaper articles published in the summer of 1993 in the *Santa Rosa Press Democrat*, a

dure's status in this case as a limited purpose public figure, defendants are entitled to the heightened protections described by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 278–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), *i.e.*, in order to recover damages, Medure has the burden of showing by clear and convincing evidence that defendants acted with actual malice; and (3) Medure has the burden of proving that the challenged statement in Armstrong's November 13, 1997 article was false.

Subsequently, objections to Magistrate Judge Sensenich's Amended Report and Recommendation were filed by Medure and defendants, and the court heard oral argument on the objections. After consideration of the parties' arguments, as well as the materials submitted in support of, and in opposition to, their respective objections, the court adopts Magistrate Judge Sensenich's amended recommendation that Medure be deemed a limited purpose public figure for purposes of this lawsuit based on her thorough analysis of the issue in the Amended Report and Recommendation. However, the court declines to adopt Magistrate Judge Sensenich's recommendation that defendants' motion for summary judgment be denied with respect to their argument that Medure has failed to show actual malice by clear and convincing evidence.

### III

For purposes of defendants' motion for summary judgment on the issue of actual malice, the following facts are undisputed:

Medure resides in New Castle, Pennsylvania. In 1991, Medure incorporated Gaming World for the purpose of managing Indian casinos. The first Indian casino managed by Gaming World was the Shooting Star Casino, which opened in Mahnomen, Minnesota in May, 1992. The Shooting Star Casino was owned by the White Earth Band of the Chippewa Indians (the White Earth Band).[6] (Medure's Depo., pp. 7, 11–13).

In August, 1993, *U.S. News & World Report* (*US News*) published an article written by James Popkin (Popkin) titled: **"Gambling with the Mob?** *Wise guys have set their sights on the booming Indian casino business*". In this article, Popkin discusses, among other things, Medure's management of the Shooting Star Casino in Mahnomen, Minnesota, indicating that the FBI became suspicious of, and began investigating, Medure when it learned that Medure was leasing a New Castle, Pennsylvania warehouse to a pasta firm that was run in the 1980s by reputed mobsters. The article implied that mobsters, through individuals and entities such as as Medure and Gaming World, were at-

Santa Rosa, California newspaper owned and published by The New York Times Company. The articles related to Medure's involvement in a partnership to develop a gambling casino at the Fountaingrove Country Club, which is located in Santa Rosa's wealthiest neighborhood. Medure alleged that he was defamed by the defendants in that action because the articles implied that he was linked to organized crime. Judge Cohill granted summary judgment for the defendants in that action, finding that Medure was a limited purpose public figure for purposes of all statements in the articles at issue, and that Medure failed to show that the defendants acted with actual malice under Pennsylvania law. Medure appealed Judge Cohill's decision, and, while the appeal was pending before the Third Circuit, the parties settled the action.

6. In March, 1992, the Bureau of Indian Affairs, an agency of the United States Department of the Interior that had regulatory authority over the operation of Indian casinos, approved a five-year management agreement between Gaming World and the White Earth Band. Subsequently, the National Indian Gaming Commission (NIGC), also an agency of the United States Department of the Interior, assumed regulatory authority over the operation of Indian casinos. (Medure Depo., p. 16).

tempting to infiltrate the lucrative Indian casino business. (Dfs.' Exh. 91).

Based on the publication of Popkin's article regarding alleged mafia infiltration of Indian-owned casinos and the article's indication that Medure was linked to organized crime, on September 24, 1993, Medure and Gaming World filed a defamation action against Popkin and *US News* in the Court of Common Pleas of Lawrence County, Pennsylvania (the *US News* case). *The Vindicator*'s New Castle Bureau covered the *US News* case from its inception. (Df.'s Exhs. 71, 72, 74, 75, 77, 80–87).

In January, 1994, Armstrong joined the staff of *The Vindicator* as a reporter. She began her employment with the newspaper in *The Vindicator*'s main office in Youngstown, Ohio. At her request, Armstrong was transferred to *The Vindicator*'s New Castle Bureau in January, 1996. (Armstrong Depo., pp. 12, 18).

On August 12, 1996, a newly constituted White Earth Band tribal council passed a resolution in response to an investigation of the reservation's finances in which Medure and Gaming World and Darrell "Chip" Wadena, Jerry Rawley, Rick Clark, Paul "Poncho" Williams and Tony Wadena, the members of the former tribal council, were accused of "looting [ ] the casino treasury." The resolution concluded as follows:

* * * * * *

**It is ordered that:**

\*All relationships with Angelo Medure/Gaming World be terminated, and that the White Earth Band is to assume total control of the casino—all of its contracts, employees and properties of every kind;

\*Angelo Medure/Gaming World be immediately and summarily removed;

\*Any and all funds due him be impounded; and

\*He be stripped of all authority in connection with any manner in which he might purport to act on behalf of the White Earth, the White Earth Reservation Tribal Council, and the operation, maintenance, supervision, finances and financial affairs of the Shooting Star Casino.

**It is further ordered that:**

Based upon [the estimated loss of monies], preliminary to a final audit, attorneys for the White Earth Band commence litigations to recover the purloined monies from Angelo Medure/Gaming World and [the former tribal council]. The estimated amount due White Earth from the above-mentioned is approximately $22 million, the equivalent of $5,500 (five thousand, five hundred) for every member of the reservation. Since the tribe is currently $6 million in debt as a result of the previous council's theft, the recovery would leave the White Earth Band with a $16 million surplus of cash.

There are, of course, millions of dollars unaccounted for by the prior tribal council and by Angelo Medure/Gaming World, which will be the subject of an ongoing search by auditors, accountants, attorneys and employees of the new tribal council and, hopefully, by state and federal officials.

* * * * * *

(Dfs.' Exh. 5).

After passage of the above-quoted resolution on August 12, 1996, neither Medure nor any other individual associated with Gaming World returned to the Shooting Star Casino. (Medure Depo., pp. 32–34).

On August 14, 1996, *The Vindicator* published an article concerning the White Earth Band's allegations against Gaming World arising out of its management of the Shooting Star Casino. The article began as follows: "Federal gambling regulators will examine allegations that an Ellwood

City management company took more profits than allowed at an Indian tribe's casino in Minnesota." (Dfs.' Exh. 79).[7] This article, including the reference to an examination by "[f]ederal gambling regulators" was based on an Associated Press release of the same date. The Associated Press release quoted Michael Cox, general counsel for the NIGC in Washington, D.C., as stating: "We are certainly interested in what is taking place and . . . (will) decide if we need to conduct an investigation of our own." (Dfs.' Exh. 27).

With regard to the White Earth Band's allegations against Medure and Gaming World, in a declaration submitted in support of defendants' motion for summary judgment, Erma J. Vizenor states:

\*　　\*　　\*　　\*　　\*　　\*

1. I am the Secretary–Treasurer of the White Earth Reservation Tribal Council aka the White Earth Reservation Business Committee, a position I have held since July 1996.

2. On August 12, 1996, the White Earth Reservation Tribal Council adopted a Resolution, an accurate copy of which is attached as Exhibit 5.

3. Immediately following the adoption of the Resolution, copies of the Resolution was (sic) sent to approximately 30–40 press organizations including television, radio, and print media outlets. Copies were also distributed throughout the White Earth Reservation. The Resolution is also available for copying and inspection to any person upon request.

4. Following the adoption of the Resolution on August 12, 1996, the Tribal Council contacted the National Indian Gaming Commission; U.S. Attorney, Department of Justice; the Office of the Inspector General, Department of the Interior; and the Minnesota Agency, Bureau of Indian Affairs to inform them of the Tribal Council's August 12, 1996 Resolution and the situation with respect to Gaming World International. A copy of the Resolution was sent or faxed to each of these agencies.

5. Following these contacts, Tom Foley of the National Indian Gaming Commission ("NIGC") contacted the Tribal Council to arrange a meeting with the Tribal Council.

6. In September or October 1996, the Tribal Council met at the Shooting Star Casino with Tom Foley and another representative of the NIGC. The Tribal Council informed the NIGC representatives of the Tribal Council's position with respect to the monies taken by Gaming World International. The Tribal Council also gave the NIGC representatives copies of documents and reports prepared by the accountant hired by the Tribal Council to investigate the monies paid the Gaming World International. The NIGC representatives asked questions of the Tribal Council concerning the management contracts between the tribe and Gaming World International.

7. During this meeting the Tribal Council requested the NIGC's assistance in recovering the money paid to Gaming World International from the Shooting Star Casino.

(Dfs.' Exh. 9).

On January 30, 1997, Armstrong's first article about the *US News* case filed by Medure and Gaming World in the Court of Common Pleas of Lawrence County, Pennsylvania was published by *The Vindicator.* In the article, Armstrong described the

---

**7.** Armstrong did not write the August 14, 1996 article for *The Vindicator.*

nature of the lawsuit, as well as the damages sought by the plaintiffs. The article stated in relevant part:

\* \* \* \* \* \*

**Gaming World:** Medure runs Gaming World International Ltd. in Ellwood City. At the time [of the alleged defamation by *US News*], the company had been managing the Shooting Star Casino for the White Earth Band Indian tribe in Minnesota.

Gaming World was fired in August, 1996, however, after the tribe accused it of taking $22 million in profits from the casino. *Federal regulators have been looking into the allegations,* although Medure has denied any wrongdoing. (Emphasis added).

\* \* \* \* \* \*

(Dfs.' Exh. 80).

The trial of the *US News* case commenced on November 3, 1997. On that day, Armstrong wrote another article about the *US News* case for *The Vindicator,* noting that jury selection was scheduled to commence that morning. Again, Armstrong described the nature of the lawsuit and the damages sought by Medure and Gaming World. Armstrong also repeated the White Earth Band's allegations against Gaming World, which she had addressed in the January 30, 1997 article in *The Vindicator.* She also stated, again, that "[f]ederal regulators have been looking into the allegations." (Dfs.' Exh. 82).[8]

On November 8, 1997, *The Vindicator* published another article written by Armstrong about the trial of the *US News* case. With respect to the allegations against Medure and Gaming World by the new tribal council of the White Earth Band arising out of Gaming World's management of the Shooting Star Casino, Armstrong stated in relevant part: "[Gaming World] has since been fired and placed under FBI investigation for allegedly skimming $22 million from the casino." (Dfs.' Exh. 85). Thus, in addition to changing "federal regulators" to "FBI," Armstrong's November 8, 1997 article stated that Gaming World was actively being investigated, rather than stating that federal regulators had been asked to investigate the allegations of the White Earth Band. In this respect, Armstrong claims that she made a mistake. (Armstrong Depo., p. 139).

On Thursday, November 13, 1997, *The Vindicator* published the article by Armstrong which is the subject of this lawsuit. The article at issue is entitled: **"Medure, magazine settle suit".** In the article, Armstrong stated, *inter alia,* that the attorneys for the parties in the *US News* case had announced on Wednesday that the case had settled "[a]fter closed-door meetings much of Tuesday." Armstrong indicated that details of the settlement would not be reported because the parties' settlement agreement included a confidentiality provision. Armstrong again described the nature of the *US News* article that led to the lawsuit, and she again reported that, at the time of the publication of the *US News* article, Gaming World had been managing the Shooting Star Casino, and that "[Gaming World] has since been fired and placed under FBI investigation on allegations of skimming $22 million from the casino." (Dfs.' Exh. 87).[9]

---

**8.** Armstrong wrote additional articles concerning the trial of the *US News* case on November 4, 1997 and November 5, 1997. However, neither of these articles state that federal regulators were looking into the White Earth Band's allegations against Medure and Gaming World. (Dfs.' Exhs. 83 and 84).

**9.** In this connection, in a declaration filed in support of defendants' motion for summary judgment, Armstrong states: "... Declarant does not know exactly what caused her, when she was writing the November 8 article about the U.S.News trial, to refer to the 'FBI' instead of 'federal regulators,' except that it was

Prior to the publication of Armstrong's November 13, 1997 article, the article was reviewed by *The Vindicator*'s assistant regional editor, Tom Wills. (Paglia Depo., p. 19).

On Friday, November 14, 1997, Medure read Armstrong's November 13, 1997 article about the settlement of his lawsuit against *US News* in *The Vindicator*. Subsequently, Medure called Armstrong to complain; however, he declined to identify the portion of the article with which he was upset. (Medure Depo., pp. 111–12).

On January 30, 1998, Medure's attorney sent a letter to Betty H. Brown Jagnow, the President/Publisher of *The Vindicator*, stating:

Dear Ms. Jagnow:

Our firm has been retained by Angelo Medure and Gaming World International, Ltd. to pursue an action for defamation against *The Vindicator* and Cory Armstrong in connection with an article titled "Medure, magazine settle suit" which was published in *The Vindicator*, Volume 109 Number 74 on November 13, 1997. The article contains false and malicious statements regarding Mr. Medure and his company.

We have tried to contact the author of the article, Ms. Cory Armstrong, numer-

ous times without success.[10] If you have insurance for defamation claims, please put your carrier on notice of this claim and request that a representative contact me. Otherwise, please have your attorney contact me directly to discuss this claim.

(Dfs.' Exh. 17).

On February 27, 1998, counsel for *The Vindicator* sent a letter to Medure's counsel, which stated:

Below is a proposed correction and apology for publication by The Vindicator. We are interested in your comments about it. It is:

A November 13, 1997 story incorrectly reported that the FBI was investigating Gaming World International, a management company owned by Ellwood City businessman Angelo Medure, in connection with an Indian casino the company operated in Minnesota. *The Vindicator* has no information that either Gaming World or Medure has been under an FBI investigation, other than a routine background investigation. *The Vindicator* apologizes for the error.

Presumably, publication of the above correction and apology will end the matter. I solicit your advice that your

an inadvertent error. Declarant did not realize the error when she was writing the November 8 article or when she was writing the November 13, 1997 article." Armstrong also states in her declaration that she "did not actually entertain serious doubts about the truth or accuracy of those passages;" that, "[b]etween the date of the publication of the November 8, 1997, article [ ], and the date of the publication of the November 13, 1997, article, no one asserted to declarant that there was any falsehood or mistake in the [statement at issue in this case];" that she "was not conscious of any mistake in these passages when she wrote them or when the Vindicator circulated them in the newspaper," and that at no time did she "bear any ill will or hostility toward [Medure], nor did she write any

article about him with the desire to injure him or with a motive to injure him." (Dfs.' Exh. 95, ¶¶ 12, 16, 21 and 23).

**10.** Contrary to counsel's statement in his January 30, 1998 letter that he had attempted to contact Armstrong on numerous occasions without success, Armstrong maintains that she had exchanged telephone messages with Medure's counsel; however, they never spoke. (Armstrong Depo., p. 174). Moreover, in a memo to her supervisor on February 2, 1998, Armstrong stated: "... I do not recall any return call from [Medure's attorney] after my second attempt to reach him. When I didn't hear from [Medure's attorney], I dropped the issue." (Armstrong Depo., Exh. 14).

client will not bring suit against The Vindicator after publication of the above correction and apology.

(Dfs.' Exh. 18).

Medure's counsel responded to the February 27, 1998 letter of counsel for *The Vindicator* by letter dated April 6, 1998. A revision of *The Vindicator*'s proposed correction and apology was enclosed with the letter. The letter of Medure's counsel noted, however, that the publishing of an apology by *The Vindicator* should not be construed as a waiver or release of Medure's claim for damages from *The Vindicator* for defamation. (Dfs.' Exh. 19).

Despite counsel's revision of the correction and apology proposed by *The Vindicator*, on Sunday, April 19, 1998, *The Vindicator* published a correction and apology that was virtually identical to its original proposal. The correction and apology stated:

**GETTING IT RIGHT**

A Nov. 13, 1997 story incorrectly reported that the FBI was investigating Gaming World International, a management company owned by Ellwood City businness Angelo Medure, in connection with an Indian casino the company operated in Minnesota. The Vindicator had no information that either Gaming World or Medure had been under the FBI investigation described. The Vindicator apologizes for the error.

(Dfs.' Exh. 88).

Several months later, this action was initiated by Medure and Gaming World.

**IV**

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a libel suit brought by a public official against a newspaper, the Supreme Court held that constitutional guarantees require a federal rule "that prohibits a public official from recovering damages for a defamatory falsehood relating to his offi-

cial conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 S.Ct. 710. The Supreme Court has extended this constitutional standard beyond public officials to include public figures. *See Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1076 (3d Cir.1988), citing, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)(plurality opinion).

With respect to the propriety of deciding the issue of "actual malice" in the context of a summary judgment motion, in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), a not-for-profit corporation and self-described "citizens' lobby" and its founder filed a libel action against a magazine, its publisher and its chief executive officer. The action arose out of articles published in the magazine which portrayed the plaintiffs as neo-Nazi, anti-Semitic, racist and Fascist. The district court granted summary judgment in favor of the defendants based on its conclusions that (a) the plaintiffs were limited purpose public figures, and, therefore, the actual malice standard announced by the Supreme Court in *New York Times* applied, and (b) the thorough investigation and research of the author of the articles, together with his reliance on numerous sources, precluded a finding of actual malice. The plaintiffs appealed, and the United States Court of Appeals for the District of Columbia affirmed in part and reversed in part. Although the Court of Appeals noted that the plaintiffs did not challenge the district court's ruling that they were limited purpose public figures and that they were thus required to prove their case under the *New York Times* standard, the Court of Appeals nevertheless held that for purposes of summary judgment the requirement that actual mal-

ice be proved by clear and convincing evidence, rather than by a preponderance of the evidence, was irrelevant. Certiorari was granted, and the Supreme Court vacated and remanded the case based on its conclusion that the Court of Appeals had not applied the correct standard in reviewing the district court's grant of summary judgment. The Supreme Court stated in relevant part:

\*     \*     \*     \*     \*     \*

Just as the "convincing clarity" requirement is relevant in ruling on a motion for a directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*. For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

\*     \*     \*     \*     \*     \*

In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. This is true at both the directed verdict and summary judgment stages. Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judg-

ment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not. (footnote omitted).

477 U.S. at 254–55, 106 S.Ct. 2505.

Applying this standard in the present case, the court concludes that defendants are entitled to a judgment in their favor as a matter of law.

V

To explain her conduct with respect to the alleged defamatory statement in the November 8 and November 13, 1997 articles published in *The Vindicator*, Armstrong claims that she made a mistake. Specifically, during her deposition, Armstrong testified as follows:

\*     \*     \*     \*     \*     \*

A.   ... As far as the FBI investigation, I can't say specifically where that —— now, somehow in my head in all the writing I was doing about [the *US News* case], when I saw federal regulators, which is what appears in November 3, somehow in my head I transposed that to be FBI. It was a mistake, and it's very regrettable.

\*     \*     \*     \*     \*     \*

(Armstrong Depo., p. 106).

Similarly, in the declaration she submitted in support of summary judgment, Armstrong states:

\*     \*     \*     \*     \*     \*

12.   The sentence "Federal regulators have been looking into the allegations" in the November 3 article (Exh. 82) is the sentence from which declarant derived the November 8 passage about the FBI investigation. Declarant does not know exactly what caused her,

when she was writing the November 8 article about the U.S. News trial, to refer to the "FBI" instead of "federal regulators," except that it was an inadvertent error. Declarant did not realize the error when she was writing the November 8 article or when she was writing the November 13, 1997 article.

\*   \*   \*   \*   \*   \*

16. At the time upon which declarant wrote the passages quoted in the above paragraphs 9 through 13, declarant did not actually entertain serious doubts about the truth or accuracy of those passages. Declarant was not conscious of any mistake in these passages when she wrote them or when the Vindicator circulated them in the newspaper.

\*   \*   \*   \*   \*   \*

(Dfs.' Exh. 95).[11]

■ A mistake is clearly insufficient to support a finding of actual malice. *See, e.g., Ocala Star–Banner Co. v. Damron,* 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971)(error resulting from editor's "mental aberration" insufficient to meet *New York Times* standard). Rather, in order to defeat defendants' motion for summary judgment on the issue of actual malice,

Medure has the burden of producing "sufficient evidence to permit the conclusion that [defendants] in fact entertained serious doubts as to the truth of [the] publication." *Time, Inc. v. Pape,* 401 U.S. 279, 291–92, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), quoting, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). He has failed to do so.

■ Medure argues that Armstrong's decision to change the words in her November 8 and November 13, 1997 articles without any investigation or attempt to confirm the alleged FBI investigation constitutes clear and convincing evidence of actual malice on her part. (Pl's Memorandum in Support, p. 4 n. 1). In essence, Medure is arguing that Armstrong's conduct was unreasonable. This argument, however, was squarely rejected by the Supreme Court in *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)(showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers insufficient to show actual malice).

Next, Medure asserts that defendants "totally ignore the 'reckless disregard'

---

**11.** Medure attempts to discredit Armstrong's claim of mere mistake, contending that Armstrong's deposition testimony "directly contradicts" statements made in the declaration submitted in support of her motion for summary judgment. In this connection, the court agrees with defendants that a side-by-side comparison of the relevant portions of Armstrong's deposition testimony and her declaration reveals no contradictions. (Defendants' Reply, pp. 11–14). Also, with respect to Armstrong's claim of mistake, the court notes defendants' suggestion of a possible basis for the alleged mistake. Specifically, the article at issue in the *US News* case stated: "The FBI is investigating a Pennsylvania asphalt-company owner [Medure] who manages a major casino in Minnesota and is expanding into tribal gambling in California...." (Dfs.' Exh. 91). Moreover, Armstrong attended a significant portion of the trial of the *US News* case and references to the FBI were made on several occasions. In fact, on November 6, 1997, Medure played a tape of a conversation between Popkin, the writer of the challenged *US News* article, and Henry Zottola, a reputed mobster, in which Henry Zottola states that FBI agents had asked him questions about Medure. Armstrong's November 8, 1997, the first article stating that Medure had been placed under FBI investigation, was written on November 7, 1997, the day after the tape was played in the *US News* trial. (Dfs.' Memorandum in Support, pp. 16–17, and Dfs.' Exhs. 13, 14, 15 and 16).

standard in their Memorandum" in support of defendants' objections to Magistrate Judge Sensenich's Amended Report and Recommendation. (Pl.'s Response, p. 9). Contrary to this assertion, however, defendants' precise argument is that Medure has failed to meet the *New York Times* standard for showing actual malice, which includes a "reckless disregard" for the truth.

In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court held that in order to find that a defendant acted in "reckless disregard" of whether a defamatory statement which he made about a public official is false within the meaning of *New York Times*, there must be sufficient evidence to permit the conclusion that the defendant had serious doubts as to the truth of his publication. The Supreme Court stated in relevant part:

> \*    \*    \*    \*    \*    \*
>
> ... "Reckless disregard," it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra*, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of ... probable falsity." 379 U.S., at 74, 85 S.Ct.

209. Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

> \*    \*    \*    \*    \*    \*

390 U.S. at 730–31, 88 S.Ct. 1323.

In the present case, Medure has failed to produce any evidence, let alone clear and convincing evidence, that Armstrong had "serious doubts" as to the truth of the challenged statement in her November 8 and November 13, 1997 articles.

Citing the decision of the Supreme Court in *Harte–Hanks, supra*, Medure further argues that Armstrong made a deliberate decision not to acquire the truth in order to make her articles more sensational. (Pl's Response, p. 10). However, as noted by defendants, the evidence presented to the court "in *Harte–Hanks* is not even remotely analogous to the evidence here." (Defendants' Reply, pp. 15–18).

In *Harte–Hanks*, the respondent, Daniel Connaughton, was the unsuccessful challenger for the position of municipal judge in Hamilton, Ohio. A local newspaper published by the petitioner, Harte–Hanks Communications, Inc., supported the re-election of the incumbent municipal judge. Shortly before the election, the incum-

bent's director of court services resigned and was arrested on bribery charges, and a grand jury investigation of those charges was in progress on November 1, 1983. On that day, the petitioner ran a front-page story quoting Alice Thompson (Thompson), a grand jury witness, as stating that the respondent had engaged in "dirty tricks" by offering her and her sister, Patsy Stephens (Stephens), jobs and a trip to Florida "in appreciation" for their assistance in the grand jury investigation of the incumbent judge's director of court services. The respondent sued the petitioner for libel, asserting that the story was false, caused damage to his personal and professional reputation and had been published with actual malice.

The jury in *Harte–Hanks* found by a preponderance of the evidence that the story in question was false and defamatory and by clear and convincing evidence that the story was published with actual malice. As a result, the jury awarded both compensatory and punitive damages. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed the judgment. Subsequently, certiorari was granted and the Supreme Court affirmed the judgment. The Supreme Court noted, among other things, that the petitioner's managing editor instructed a group of the newspaper's reporters to interview all of the witnesses to the conversation between the respondent and Thompson with one exception—Stephens—the only witness who was not a supporter of the respondent. In this regard the Supreme Court stated: "It is utterly bewildering in light of the fact that the [petitioner] committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events." 491 U.S. at 682, 109 S.Ct. 2678. The Supreme Court noted that, if the petitioner had serious doubts about the truth of Thompson's allegations, but was committed to running the story, there was good reason not to interview Stephens— "while denials coming from [the respondent's] supporters might be explained as motivated by a desire to assist [the respondent], a denial coming from Stephens would quickly put an end to the story." 491 U.S. at 682, 109 S.Ct. 2678. The Supreme Court further noted that the petitioner's decision not to listen to the tapes of the interview between the respondent and Thompson and Stephens in the respondent's home, which had been provided to the petitioner, also supported a finding of actual malice because much of what Thompson said about the interview in which she and Stephens were allegedly offered jobs and a trip to Florida by the respondent could easily have been verified or disproved by listening to the tapes. The Supreme Court stated that one might reasonably infer in light of the evidence presented that "the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning Thompson's veracity." 491 U.S. at 684, 109 S.Ct. 2678. In addition, the Supreme Court noted that Thompson's most serious charge—that the respondent intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not disclose the tapes—was not only highly improbable, but inconsistent with the fact that the respondent had actually arranged a lie detector test for Stephens and then delivered the tapes to the police. Moreover, "[t]he hesitant, inaudible, and sometimes unresponsive and improbable tone of Thompson's answers to various leading questions raise[d] obvious doubts about her veracity." 491 U.S. at 691, 109 S.Ct. 2678. Clearly, the evidence presented to the court in *Harte–Hanks* is distinguishable from the evidence in this case.

■ Finally, the court notes its agreement with defendants that the burden of proving that Armstrong's alleged defamatory statement was false is on Medure, and he has failed to offer evidence to meet that burden. Regarding the issue of falsity, in his response to defendants' objections to Magistrate Judge Sensenich's Amended Report and Recommendation, Medure states: "Any contention that plaintiff has not met his burden of proving falsehood is just shy of ridiculous in light of defendants' retraction." (Pl's Response, p. 2). *The Vindicator*'s retraction, however, stated, in relevant part, that the newspaper "had no information that either Gaming World or Medure had been under the FBI investigation described." This statement is very different from a statement indicating that, in fact, neither Gaming World nor Medure had been under an FBI investigation in connection with the management of the Shooting Star Casino.

Medure also contends that he introduced evidence during the trial of the *US News* case "refuting the existence of any FBI investigation." (Pl's Response, p. 5). In support of this contention, Medure cites pages 14 and 15 of his deposition in this case, rather than his testimony during the trial of the *US News* case. In any event, a review of those pages of Medure's deposition testimony fails to reveal any reference to the FBI. Rather, during this portion of his deposition, Medure was responding to questions about the approval by the Bureau of Indian Affairs of his agreement with the White Earth Band to manage its casino. (Medure's Depo., pp. 14–15).

Medure also makes statements such as "[w]ithout question, the newspaper was on notice that the FBI had never placed Medure under investigation," and "[t]o the extent that it is plaintiff's burden to prove falsity, which plaintiff denies, plaintiff introduced substantial evidence that Medure had not been placed under FBI investiga-

tion in November of 1997." (Pl's Response, pp. 9, 14). However, he fails to cite any evidence that supports these statements.

Finally, Medure asserts that the declaration of Erma J. Vizenor, the Secretary/Treasurer of the White Earth Band's tribal council since July, 1996, which was submitted by defendants in support of their objections to Magistrate Judge Sensenich's Amended Report and Recommendation (Dfs.' Exh. 9), indicates that "... despite the Tribe's best efforts, the FBI refused to conduct any investigation into their allegations." (Pl.'s Response, p. 16). This assertion clearly is not supported by Ms. Vizenor's declaration.

In conclusion, after reviewing the materials submitted in support of, and in opposition to, the parties' respective objections to Magistrate Sensenich's Amended Report and Recommendation, the court concludes that a jury applying the clear and convincing evidentiary standard to the evidence of record in this case could not reasonably find for Medure. Accordingly, judgment will be entered in favor of defendants and against Medure.

An order follows.

### ORDER

AND NOW, this 29th day of November, 2002, in accordance with the foregoing memorandum, it is hereby ORDERED as follows:

1. The motion of defendants, The Vindicator Printing Company and Cory Armstrong, for summary judgment pursuant to Fed.R.Civ.P. 56 is granted.

2. The Clerk shall enter judgment in favor of defendants and against plaintiff, Angelo Medure.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SENSENICH, United States Magistrate Judge.

### I.  *RECOMMENDATION*

It is recommended that the Motion for Summary Judgment filed by Defendants be denied.

### II.  *REPORT*

Plaintiff Angelo Medure brings this action for defamation against Defendants The Vindicator Printing Company, publisher of *The Vindicator,* a daily newspaper based in Youngstown, Ohio, and *Vindicator* reporter Cory Armstrong.  The case arises out of the November 13, 1997 publication of an article by Armstrong, which contained the erroneous statement that Gaming World International, Inc., a company owned by Medure that managed the Shooting Star Casino on a Minnesota Indian reservation until the contract was terminated by the tribe in August 1996, had been "placed under FBI investigation on allegations of skimming $22 million from the casino." Plaintiff names as Defendants the Vindicator Printing Company, an Ohio corporation that publishes *The Vindicator,* and Armstrong, who was an Ohio citizen at the time this action was commenced and is now a citizen of Wisconsin.  (Armstrong Decl. ¶ 2.) Armstrong is no longer a reporter for *The Vindicator.* (Armstrong Dep. at 6.)

*Facts* [1]

Angelo Medure is an entrepreneur who resides in New Castle, Lawrence County, Pennsylvania.  (Medure Dep. at 7.) He is the chief executive officer of Gaming World, International, Inc. (Gaming World), a Delaware corporation founded in 1991 that was in the business of developing and managing casinos on Indian reservations. (Medure Dep. at 11–12.) Gaming World's first project was developing and managing the Shooting Star Casino for the White Earth Band of Chippewa Indians (White Earth Band) in Mahnomen, Minnesota, which took place in 1991 and early 1992. The Shooting Star opened in May 1992. (Medure Dep. at 12–13.) Gaming World entered into a five-year contract to manage the Shooting Star for the White Earth Band, which would have expired in approximately March 1997.  (Medure Dep. at 16.)

In August 1993, *U.S. News and World Report* (*US News*) published an article by James Popkin titled "Gambling with the Mob? Wise guys have set their sights on the booming Indian casino business." (Medure Dep. at 58, 76 & Ex. 5;  Defs.' Ex. 91.)  In the article, Medure was falsely accused of being under investigation by the FBI for alleged connections to the Mafia, and the article implied that the Mafia, through Medure and Gaming World, was attempting to infiltrate Indian gaming.  Plaintiff testified that, shortly after the article was published, he contacted Brendan "Mike" Balen, an FBI agent whom he knew at the Minneapolis, Minnesota FBI office, and Balen told him that he was not under any investigation.  (Medure Dep. at 100–03.)

On September 24, 1993, Medure and Gaming World brought suit against Popkin and *US News* in the Court of Common

---

**1.**  As Plaintiff notes, the Defendants have included in their recitation of the facts the history of Medure's professional and business background, the legislative history of Indian gaming, the history of the White Earth Band's foray into Indian gaming, the negotiation of Gaming World's management contract and changes in the White Earth Band's leader-

ship.  (Defs.' Br. at 2–10.)  These facts are not relevant to this case and are not recited herein.  However, the two prior defamation cases are relevant because the article at issue in this case arose during coverage of the first case, and Defendants rely upon the second case for the determination of whether Medure is a limited purpose public figure.

Pleas of Lawrence County, Pennsylvania (the "*US News* case"). *The Vindicator*'s New Castle bureau covered this case from its inception. (Defs.' Exs. 71, 72, 74, 75, 77, 80–87.) Cory Armstrong joined the staff of *The Vindicator* in January 1994 as a reporter. (Armstrong Decl. ¶ 3; Armstrong Dep. at 12.) In January 1996, Armstrong took over the New Castle bureau of *The Vindicator* and she was assigned to cover the *US News* defamation trial by her immediate supervisor, Cynthia Rickard. (Armstrong Dep. at 13, 18, 24, 46, 60–61; Paglia Dep. at 14, 31.) As explained below, the article at issue in this case was a report of the settlement that ended the *US News* case in November 1997.

### *Medure v. New York Times*

Meanwhile, in June 1994, Medure filed a defamation claim in this court against The New York Times Company and its subsidiary, The Press Democrat, arising out of two newspaper articles published in the summer of 1993 in the *Santa Rosa Press Democrat*, a Santa Rosa, California newspaper owned and published by the Times. In that action, *Medure v. New York Times Co.*, 60 F.Supp.2d 477 (W.D.Pa.1999) (the *NY Times* case), Medure alleged that articles published on June 13, 1993 and August 18, 1993, which were about his proposed development of a casino at the Fountaingrove County Club in Santa Rosa and which discussed the Shooting Star Casino at length, defamed him by linking him to known organized crime figures. (Defs.' Ex. 12.) As explained below, that case ended when Judge Cohill granted summary judgment for the defendants and the parties settled during the appeal.

### *Tribal Resolution*

On August 12, 1996, the five-member tribal council of the White Earth Band passed a resolution that terminated the tribe's contract with Gaming World, ordered that "Angelo Medure/Gaming World be immediately and summarily removed" and ordered that Medure "be stripped of all authority" in connection with "the operation, maintenance, supervision, finances and financial affairs of the Shooting Star Casino." (Defs.' Ex. 5 at 3.) The resolution accused Medure of working with a previously constituted tribal council to "fleece the casino and the people of White Earth," and accused him of "looting of the casino treasury," and it recommended that litigation be initiated to "recover the purloined monies." (*Id.* at 2–3.) The resolution estimated that the amount owed to the White Earth Band from actions by Medure and the previous tribal council to be approximately $22 million.

Erma J. Vizenor, Secretary–Treasurer of the tribal council (Vizenor Decl. II [2] ¶ 1), states that, following the adoption of the tribal resolution on August 12, 1996, the council contacted and sent a copy of the resolution to the following agencies: the National Indian Gaming Commission (NIGC); the United States Attorney, Department of Justice; the Office of the Inspector General, Department of the Interior; and the Minnesota Agency, Bureau of Indian Affairs. (*Id.* ¶ 4.) She further states that:

> Following these contacts, Tom Foley of the [NIGC] contacted the Tribal Council to arrange a meeting with the Tribal Council.
>
> In September or October 1996, the Tribal Council met at the Shooting Star

**2.** Defendants have submitted two declarations by Erma Vizenor. The first (Vizenor Decl. I) constitutes Exhibit 4 of their appendix and concerns the arbitration proceeding. The second (Vizenor Decl. II) constitutes Exhibit 9 and concerns the tribal council's contacts with various agencies after terminating the contract with Gaming World.

Casino with Tom Foley and another representative of the NIGC. The Tribal Council informed the NIGC representatives of the Tribal Council's position with respect to the monies taken by Gaming World International. The Tribal Council also gave the NIGC representatives copies of documents and reports prepared by the accountant hired by the Tribal Council to investigate the monies paid the Gaming World International. The NIGC representatives asked questions of the Tribal Council concerning the management contracts between the tribe and Gaming World International.

During this meeting, the Tribal Council requested the NIGC's assistance in recovering the money paid to Gaming World International from the Shooting Star Casino.

(*Id.* ¶¶ 5–7.)

Gaming World submitted a demand for commercial arbitration, claiming lost income from the remainder of its five-year contract. (Defs.' Ex. 6; Medure Dep. at 45; Vizenor Decl. I ¶ 3.) The White Earth Band counterclaimed for $22 million, including "excess distribution of casino profits" for a total of $20.8 million including interest, Medure management salaries for a total of $349,000 and salaries of other Gaming World managers for a total of $677,000. (Defs.' Ex. 7 at 2; Vizenor Decl. I ¶ 4.) As of October 1999, the arbitration remained unresolved. (Medure Dep. at 99.)

*US News Case Goes to Trial*

Trial began in the *US News* case on November 3, 1997. Cory Armstrong attended much of the trial on behalf of *The Vindicator*. (Armstrong Decl. ¶ 4; Armstrong Dep. at 76.) Medure asserts that he introduced evidence refuting the existence of any FBI investigation, and he stated that he had successfully passed numerous background checks by both the FBI and the Bureau of Indian Affairs, the

predecessor to the NIGC. (Medure Dep. at 14–15.) He states that he introduced evidence that the false FBI accusation cost him and Gaming World economic damages in excess of $50 million.

Armstrong was present during settlement negotiations. The case settled on November 12, 1997, after Medure's direct examination (Medure Dep. at 62; Armstrong Decl. ¶ 5), and a joint statement was issued on December 1, 1997. (Medure Dep. at 70 & Exs. 6–7; Defs.' Ex. 92.) Armstrong was given a copy of the retraction which *US News* agreed to publish and was informed by a "reliable source" that the settlement included a substantial monetary payment to Medure. (Armstrong Dep. at 156, 158–160.) The specific terms of the settlement are confidential. Armstrong asked Medure if he wanted to make a comment for purposes of the article, but Medure declined. (Armstrong Dep. at 164.)

*Articles About the Trial*

On January 30, 1997, Cory Armstrong wrote her first article for *The Vindicator* about the *US News* case, which was then in the pretrial stage. The article stated that:

> Medure runs Gaming World International Ltd. in Ellwood City. At the time, the company had been managing the Shooting Star Casino for the White Earth Band Indian tribe in Minnesota.
>
> Gaming World was fired in August 1996, however, after the tribe accused it of taking $22 million in profits from the casino. Federal regulators have been looking into the allegations, although Medure has denied any wrongdoing.

(Defs.' Ex. 80.)

On November 3, 1997, the date trial began, Armstrong wrote an article about jury selection, which included a recap of the firing of Gaming World. She repeated

the discussion quoted above from the January 30, 1997 article. (Defs.' Ex. 82.) On November 4 and November 5, 1997, Armstrong's articles about the trial stated that Gaming World was "fired amid allegations that it took $22 million in profits from the casino." (Defs.' Exs. 83–84.) Armstrong did not attend the proceedings on November 5, so no article appeared on November 6. (Armstrong Dep. at 76, 100.)

On November 8, 1997, *The Vindicator* published another article about the defamation trial. This article contained the recap paragraph that had been used in the November 3 article, but the phrase "federal regulators" was changed to "FBI" so that it read as follows: "The company has since been fired and placed under FBI investigation for allegedly skimming $22 million from the casino." (Defs.' Ex. 85 at 2.)

On November 13, 1997, *The Vindicator* published the article at issue, titled "Medure, magazine settle suit." In the article, Armstrong reported that the parties had settled the defamation suit and that they had issued a joint statement that *US News* "did not intend to imply that either Mr. Medure or Gaming World was involved in any criminal activity or that they knowingly had done business or otherwise engaged in any improper activity or relationship with any member of organized crime, and the article should not have been read to suggest otherwise." (Defs.' Ex. 87 at 2.) The article concluded with the following paragraphs:

> The article [in *US News* ], among other things, linked Medure to Pittsburgh's Henry Zottola, who was named as part of the Michael Genovese crime family as part of a Pennsylvania Crime Commission Report.

> At the time, Gaming World managed the Shooting Star Casino on a Minnesota Indian reservation. The company has since been fired and placed under FBI

investigation on allegations of skimming $22 million from the casino.

> Zottola, 61, was indicted April 17 by a federal grand jury in Pittsburgh on conspiracy and money-laundering charges in connection with his alleged illegal involvement in an Indian casino in California.

> Medure has said he knew Zottola— then president of Rocca's Italian Foods—because the business leased a New Castle warehouse from Medure in 1986.

(Defs.' Ex. 87.) The article was reviewed by Tom Wills, the night editor at *The Vindicator*, and published as written. (Paglia Dep. at 19–20.)

Armstrong's reference to the FBI in the second paragraph quoted above was a mistake. She has stated that she copied the passage used in the November 13 article from the November 8 article, and that the November 8 article was a mistake and had been derived from prior *Vindicator* articles. (Armstrong Decl. ¶¶ 7–8.) Ultimately, she traced the January 30, 1997 passage about "federal regulators" back to an August 14, 1996 article published in *The Vindicator*, but not written by her. (Armstrong Decl. ¶ 14.) The August 14, 1996 article opened with the sentence: "Federal gambling regulators will examine allegations that an Ellwood City management company took more profits than allowed at an Indian tribe's casino in Minnesota." (Defs.' Ex. 79.) It stated that "Michael Cox, general counsel for the [NIGC] in Washington, said the agency will examine the dispute and decide whether to open an investigation." (*Id.*)

This article was based upon an Associated Press (AP) dispatch, also issued on August 14, 1996, that reported that the NIGC would examine the dispute between Gaming World and the tribe and decide whether to open an investigation. (Defs.'

Ex. 27.) Thus, in addition to changing the phrase "federal regulators" to "FBI," Armstrong's article also erroneously stated that an active investigation was underway, rather than the reality, which was merely that federal regulators had been asked to investigate the dispute back in August 1996. Neither Armstrong nor anyone else at *The Vindicator* checked to see whether, between August of 1996 (when the AP wire was issued) and November of 1997 (when her story was written), the NIGC ever actually looked into the allegations or placed Medure under investigation. (Armstrong Dep. at 140–43.)

> Armstrong states that she
>
> does not know exactly what caused her, when she was writing the November 8 article about the U.S. News trial, to refer to the "FBI" instead of "federal regulators," except that it was an inadvertent error. [She] did not realize the error when she was writing the November 8 article or when she was writing the November 13 article.

(Armstrong Decl. ¶ 12.) She further states that she "did not actually entertain serious doubts about the truth or accuracy of those passages. [She] was not conscious of any mistake in these passages when she wrote them or when the Vindicator circulated them in the newspaper." (Armstrong Decl. ¶ 16.) Armstrong notes that no one told her there was any mistake in any article until after the November 13 article was published. (Armstrong Decl. ¶¶ 17–21.)

### The Aftermath

On November 14, 1997, the day after the article appeared, Medure called Armstrong to complain. However, he declined to identify the specific portion of the article to which he objected. (Medure Dep. at 111; Armstrong Dep. at 171–72.) He stated that "I knew I was going to be suing [*The Vindicator* ] then." (Medure Dep. at 113.) He had no further communication

with Armstrong or anyone else from *The Vindicator.* (Medure Dep. at 117.)

Over the next several weeks, Armstrong and Richard DiSalle, Medure's attorney, exchanged messages but were unable to speak to one another. (Armstrong Dep. at 172, 174–75.) Armstrong stated that, after her second unsuccessful attempt to speak to DiSalle, "I dropped the issue." (Armstrong Dep. Ex. 14; see Armstrong Dep. at 175.) On January 30, 1998, DiSalle sent a letter to Betty H. Brown Jagnow, President/Publisher of *The Vindicator.* He wrote that:

> Our firm has been retained by Angelo Medure and Gaming World International, Ltd. to pursue an action for defamation against *The Vindicator* and Cory Armstrong in connection with an article titled "Medure, magazine settle suit" which was published in *The Vindicator,* Volume 109 Number 74 on November 13, 1997. The article contains false and malicious statements regarding Mr. Medure and his company.
>
> We have tried to contact the author of the article, Ms. Cory Armstrong, numerous times without success. If you have insurance for defamation claims, please put your carrier on notice of this claim and request that a representative contact me. Otherwise, please have your attorney contact me directly to discuss this claim.

(Defs.' Ex. 17.)

Anthony Paglia, Senior Regional Editor for *The Vindicator* since 1989 (Paglia Decl. ¶ 1; Paglia Dep. at 7), states that this letter from DiSalle came to his attention on February 2, 1998, at which time he did not know what in the article was claimed to be a falsehood. (Paglia Decl. ¶ 8; Paglia Dep. at 36.) With the assistance of counsel for *The Vindicator,* Paglia investigated and discovered that Armstrong had made a mistake in reporting that Gaming

World had been placed under FBI investigation. (Paglia Decl. ¶ 9; Paglia Dep. at 36–39.)

Mr. Paglia states that:

Vindicator management then decided it would publish an apology, explaining that it had no information that the FBI investigation described actually had happened. The Vindicator could not categorically say that no such investigation had occurred because, at that time, the Vindicator did not know whether there actually had been such an investigation. The Vindicator decided to show the proposed apology to Mr. Medure's counsel in advance of publication for Mr. Medure's input.

(Paglia Decl. ¶ 10.) On February 27, 1998, counsel for *The Vindicator* sent a letter to Attorney DiSalle, which included the proposed apology. (Defs.' Ex. 18.) On April 6, 1998, Attorney DiSalle responded with a counter-proposed apology. (Defs.' Ex. 19.)

Nevertheless, *The Vindicator* decided to proceed with publishing the apology that it originally had proposed. The apology was published on page 2 of the Sunday, April 19, 1998 issue of *The Vindicator*. (Paglia Decl. ¶ 11.) The apology stated as follows:

**GETTING IT RIGHT**

A Nov. 13, 1997, story incorrectly reported that the FBI was investigating Gaming World International, a management company owned by Ellwood City businessman Angelo Medure, in connection with an Indian casino the company operated in Minnesota. The Vindicator had no information that either Gaming World or Medure had been under the FBI investigation described. The Vindicator apologizes for the error.

(Defs.' Ex. 88.) On October 19, 1998, Medure and Gaming World initiated this action for defamation arising out of the November 13, 1997 article.

*Summary Judgment in N.Y. Times Case*

On August 20, 1999, Judge Cohill entered an order granting the defendants' motion for summary judgment in the *NY Times* case. He concluded that "Angelo Medure was a limited purpose public figure for purposes of all statements complained of in the newspaper articles at issue, and that he has failed to present clear and convincing evidence from which a jury could find that any of the statements complained of were made with actual malice." *Medure v. The New York Times Co.*, 60 F.Supp.2d 477, 482 (W.D.Pa. 1999). Medure appealed, but the appeal was dismissed by the Third Circuit on March 20, 2000 when the parties settled the case.

*Procedural History*

On October 19, 1998, Medure and Gaming World initiated this case by filing a complaint in the Court of Common Pleas of Lawrence County, Pennsylvania. Count I alleged that the Defendants defamed Medure and Gaming World in the November 13, 1997 article by imputing criminal activity to them. Count II alleged that neither Medure nor Gaming World was a public figure nor was involved in any public controversy and that Defendants' conduct was malicious, wanton, willful, reckless intentional, and outrageous, and therefore the complaint requested punitive damages.

On November 17, 1998, Defendants removed the action to this Court on the basis of diversity jurisdiction. On October 19, 1999, an order was entered granting the stipulated dismissal of Gaming World and all claims asserted on its behalf as a plaintiff, as well as any and all claims by Medure for economic injuries including injuries to his "business dealings," present and future financial losses and damage and "economic losses, including lost income and loss of earning capacity." (Doc. # 8.) On

January 31, 2000, Defendants filed a Motion for Summary Judgment.

*Summary Judgment*

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. Once that burden is met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendants argue that: 1) Medure is a limited public figure for purposes of reporting about the management of the Shooting Star Casino, as Judge Cohill determined in the *NY Times* case; 2) he has failed to produce clear and convincing evidence of actual malice; 3) he has not demonstrated that the article was false because Gaming World was fired amid allegations of improper behavior (the article was far less severe than the actual allegations made by the tribe) and whether it was the FBI or federal regulators who were investigating does not make a substantial difference; 4) the fair report privilege protects a substantially accurate statement based on the tribal resolution; 5) *The Vindicator* derived its report from an AP dispatch so that in conveying its

essence the paper was under no duty to verify the contents; and 6) the statement is not "of and concerning" Medure, but is about Gaming World and although he is the president, he is not the company.

Plaintiff argues that: 1) he is not a public figure because the controversy that was the subject of the article was a private matter (a defamation suit between private parties); 2) actual malice is an issue of fact and Armstrong recklessly disregarded the truth in her article; 3) the article was neither true nor substantially true, and Defendants have not met their burden of demonstrating that it was true; 4) the fair report privilege does not apply because Armstrong did not read the tribal resolution at the time she wrote her article, the tribal resolution was not an official or governmental report for purposes of the privilege, and even if the privilege applied she abused it by failing to give a fair and substantially accurate report of what it said; 5) the "wire service privilege" has not been adopted in Pennsylvania and even if it applied the material must be republished without substantial changes; and 6) the issue of whether the comment referred to Medure is for the jury to decide, because reasonable people believed that it did.

*Public or Private Figure*

Determining whether a plaintiff in a defamation case is a public or private figure is a question of law for the court to decide. *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1081 & n. 4 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *Iafrate v. Hadesty*, 423 Pa.Super. 619, 621 A.2d 1005, 1007 (1993).[3] In a defamation case, whether the plaintiff is a public or private figure is an important distinction, because the Supreme Court has held that a media defen-

---

**3.** As explained below, Pennsylvania law should be applied in this case.

dant has a constitutional privilege for the publication of defamatory falsehoods concerning public figures, and that a plaintiff alleging such defamation is required to show clear and convincing evidence of "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (constitutional protection for defamation of public official); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (constitutional protection for defamation of public figure). Actual malice requires that a false statement be made "with knowledge that it was false or with reckless disregard for whether it was false or not." *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710.

On the other hand, a private figure plaintiff allegedly defamed in speech of private concern need only demonstrate simple fault on the part of the defendant to recover damages, including punitive damages. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761, 764, 774, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). However, when the plaintiff is a private figure but the speech is of public concern, the quantum of proof depends upon the type of damages sought—simple fault for actual damages, but actual malice for presumed or punitive damages. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The Supreme Court has identified two types of public figures for purposes of defamation: all purpose public figures, such as politicians, who are widely recognized, and limited purpose public figures, who may not be well known on every issue but who are sufficiently involved in a particular area to be considered as public figures for that purpose. *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997. "Such limited public purpose figures have usually 'thrust themselves to the forefront of particular public controversies in order to influence the res-

olution of the issues involved.'" *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1077 (3d Cir.1988) (quoting *Gertz*, 418 U.S. at 345, 94 S.Ct. 2997). *See Rutt v. Bethlehems' Globe Publishing Co.*, 335 Pa.Super. 163, 484 A.2d 72, 80 (1984); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.) *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir.1985).

In *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the Supreme Court held that a plaintiff who chose not to appear before a grand jury investigating the activities of Soviet intelligence agents in the United States and who was thereafter cited for contempt was not a limited purpose public figure for purposes of comment on his connection with or involvement in Soviet espionage in the 1940s and 1950s. The Court stated that "the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status." *Id.* at 157, 99 S.Ct. 2701. The Court further stated that:

Petitioner's failure to appear before the grand jury and citation for contempt no doubt were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect reestablish the doctrine advanced by the plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44, 91 S.Ct.

1811, 29 L.Ed.2d 296 (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*.

*Id.* at 167–68, 99 S.Ct. 2701.

In *McDowell*, the Court of Appeals held that an architect who participated in numerous publicized and controversial building projects, one of which he had successfully bid upon despite knowing its controversial nature, was a limited public purpose figure as to his participation in those projects. *Id.* at 949–50. Similarly, in *Marcone*, the court held that the plaintiff, an attorney who represented members of notorious motorcycle gangs and who also had social contacts with their members, was a limited public purpose figure on the issue of his alleged participation in a drug conspiracy with those members (he had been indicted but the indictment was subsequently dismissed). 754 F.2d at 1083.

In *Schiavone*, the court held that a construction company and its majority owner were limited public purpose figures. The court cited the fact that the plaintiffs: 1) campaigned for President Reagan; 2) conducted a private investigation of the Special Prosecutor and other investigators of the Secretary of Labor; 3) wrote numerous letters to the editor in various national and local publications complaining about how the Secretary was being treated; 4) bragged in their promotional literature about their close ties with the Secretary; and 5) worked exclusively on public projects. 847 F.2d at 1078.

In making the determination of whether a plaintiff is a limited purpose public figure, "[t]he court must consider (1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy." *McDowell*, 769 F.2d at 948 (citing *Marcone*, 754 F.2d at 1082). In the *NY Times* case, Medure argued that the public controversy should have been narrowly circumscribed as whether an Indian casino should be permitted at all in Fountaingrove, while the defendants argued for a broader definition of the controversy. Judge Cohill concluded that:

> Medure thrust himself to the forefront of a broad public controversy over gaming casinos on Indian property, and ... this controversy encompassed more than just the isolated Fountaingrove project. Certainly, the proposed casino was a matter of great public controversy, both in Santa Rosa, where Fountaingrove was located, and in the surrounding geographic area, including Sonoma County and the *Press Democrat's* circulation area. Indeed, in trying to gain official and community approval for the Fountaingrove Casino plan through media and public relations events, Medure helped to create the controversy and became, as an individual and a businessman, a significant part of it.

60 F.Supp.2d at 485. Judge Cohill concluded that part of what was controversial about the project was the effect the casino's development might have on the area, including whether it might attract the involvement of organized crime, and therefore Medure's past business activities with individuals later determined to be involved with organized crime were germane to the controversy being reported. *Id.*

Defendants contend that Judge Cohill's conclusions about Medure in the *NY Times* case effectively control Medure's

status for purposes of this case. But the article at issue here was not about Indian gambling, or even the Shooting Star Casino. There was no proposal to construct a casino on an Indian reservation in New Castle, so that all of Medure's previous dealings in that business would be part of the controversy. Rather, *The Vindicator* was reporting that Medure and *US News* had settled a defamation case. Armstrong stated that she covered the trial because "Mr. Medure is a prominent man in Lawrence County. His company is also well known in the community, and he was suing a national publication. I have no doubt it was newsworthy." (Armstrong Dep. at 79.) She also stated that libel trials are not commonplace in Lawrence County, that Medure owned several businesses and that his nephew owned a restaurant. (Armstrong Dep. at 80–81.) Indeed, based upon the record, *The Vindicator* published articles about any topic related to Medure, indicating that he was considered "newsworthy." (Defs.' Exs. 67–72, 74–87.)

As noted above, however, the Supreme Court has rejected the notion that merely because a matter attracts media attention, the person described must be a limited purpose public figure. The Court of Appeals has approvingly cited the following description of public controversy:

A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.

*Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980) (citation and footnote omitted), *cited in Marcone,* 754 F.2d at 1083. Although the public may have been interested in Medure's defamation suit against *US News*, no ramifications of that suit extended to anyone other than the direct participants therein.

Defendants also cite other examples of Medure's "prominence" in Western Pennsylvania, including: his attempt to purchase a bank in Minnesota in 1993 (Defs.' Exs. 55–57, 93); the 1993 arrest of his son in Pittsburgh (Defs.' Ex. 31); his interest in putting a casino at the Fox Chapel Yacht Club that he had purchased if riverboat gambling was approved (Defs.' Exs. 42–47); and the fact that his nephew owns a restaurant named Medure's (Armstrong Dep. at 81; Leuben Dep. at 35). None of these issues has any bearing on his defamation suit against *US News* or the reports about the case and its settlement. Therefore, they are not relevant to the determination of whether he is a limited purpose public figure with respect to the November 13, 1997 article in *The Vindicator.*

Defendants argue in their reply brief that filing a defamation case itself is a form of public exposure that could transform Medure into a limited purpose public figure. They acknowledge that the Supreme Court held in *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), that the former wife of the scion of a wealthy industrial family was not a limited purpose public figure when she divorced him because she "was compelled to go to court by the State in order to obtain legal release from the bonds of matrimony." *Id.* at 454, 96 S.Ct. 958. They argue that this case is distinguishable because Medure had other modes of obtaining relief from the defamation in the *US News* article beyond filing a lawsuit.

However, the Supreme Court, in discussing the private figure plaintiff in *Gertz*, stated that "[h]e has relinquished no part of his interest in the protection of his good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood." 418 U.S. at 345, 94 S.Ct. 2997. Thus, the Supreme Court recognized that plaintiffs may seek redress for defamation in the courts. To hold that by doing so they transform themselves into public figures because other means of redress are available would be to disregard the distinction between private and public figures outlined by the Court. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) ("those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.")

Defendants have not demonstrated Medure was a limited purpose public figure because he filed a defamation suit against *US News*. Nor have they cited support for the argument that the insertion into an article that involved a private controversy of a "background" section that discussed Medure's involvement with the Shooting Star Casino transformed the entire article into a matter of public concern such that Medure would be a limited purpose public figure.[4]

Moreover, in the *NY Times* case, Judge Cohill noted that, "[a]s part of our determination of whether Medure is a limited purpose public figure, we must also consider whether the statements complained of relate to the public issue as we have defined it. This is a necessary step, since statements 'wholly unrelated to the controversy ... do not receive *New York Times* protection.'" 60 F.Supp.2d at 486 (quoting *Waldbaum*, 627 F.2d at 1298). Thus, because the controversy in the article in question was a defamation suit, the statements about the termination of Gaming World would be statements wholly unrelated to the controversy, and therefore they would not be entitled to the heightened protections described in *New York Times v. Sullivan*.

Defendants argue that the controversy in this case should be considered the same as the controversy in the *NY Times* case, that is the issue of Indian gambling and possible involvement therein by members of organized crime. However, that argument is not supported by the record: Armstrong stated that she covered the *US News* defamation case because it was "newsworthy" and that she included the section about the firing of Gaming World because it was "relevant." Moreover, even accepting their proposed scope of the controversy, they have not explained why a narrative of events that occurred after Gaming World was fired by the tribe would relate to that controversy.

Because Medure was not a limited public purpose figure for purposes of the November 13, 1997 *Vindicator* article, he does not have to demonstrate the existence of actual malice by the Defendants in order to recover damages. Therefore, Defendants' argument that Medure has not produced clear and convincing evidence that they acted with actual malice will not be considered.

### Burden of Proof of Falsity

The Supreme Court has also addressed the assignment of the burden of proof to demonstrate truth or falsity in a defamation case. A public figure plaintiff bears the burden of showing that the statements at issue are false. *Philadelphia Newspa-*

---

4. Armstrong stated that this information was relevant so that readers would know that Gaming World no longer managed the Shooting Star Casino. (Armstrong Dep. at 75, 83, 168.)

*pers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Ertel v. Patriot–News Co.,* 544 Pa. 93, 674 A.2d 1038, 1041 (1996). In addition, when "the plaintiff is a private figure and the newspaper articles are of public concern … the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall … to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id.* at 776, 106 S.Ct. 1558. However, when private figure plaintiffs bring suit regarding speech of private concern, a state may allocate the burden to prove the truth of the statement to the defendant.

*Choice of Law*

The parties have mentioned, but not addressed, the choice of law question. Defendants note that either the law of Ohio or Pennsylvania might apply, although they state without elaboration that "strong arguments exist for applying only Ohio law." (Defs.' Br. at 44 n. 22.) Plaintiff's brief cites only Pennsylvania cases, but does not discuss the choice of law issue.

The Restatement 2d of Conflict of Laws § 150(2) states that: "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." Medure is a Pennsylvania resident. (Medure Dep. at 7.) He testified that he read the article in an issue of *The Vindicator* that he purchased in New Castle, Pennsylvania. (Medure Dep. at 109–10, 112.) Mr. Paglia stated that the article ran on the front page of the Pennsylvania edition of *The Vindicator,* and therefore it appeared in 3600 newspapers, but he also thought that it had appeared in all of the other editions, for a total of 90,000 newspapers. (Paglia Dep. at 17–18.) Thus, the harm to Medure's reputation would have occurred primarily in Pennsylvania.

Because the matter was published in Pennsylvania and caused harm to his reputation primarily in Pennsylvania, the law of Pennsylvania should apply. *See Marcone,* 754 F.2d at 1077 ("Inasmuch as Marcone is a Pennsylvania resident and any harm to his reputation that may have occurred centered in that state, the district court was correct to apply Pennsylvania law.") In the *NY Times* case, although the issue was not discussed, Judge Cohill did not question the application of Pennsylvania law even though the defendants were publishing companies located in New York and California and the offending statements had appeared in a California newspaper. *Medure,* 60 F.Supp.2d at 484. Therefore, Pennsylvania law will be applied.

Defendants contend that all libel plaintiffs bear the burden of demonstrating that an allegedly defamatory statement is false. (Defs.' Br. at 25.) As the cases described above hold, however, that is not an accurate summary of the law. Because Medure was not a limited purpose public figure for purposes of the November 13, 1997 article, which concerned a private defamation suit and not a matter of public concern, the constitutional concerns of *Hepps* are not implicated. State law may allocate to the defendant in a defamation case involving a private figure the burden of demonstrating the truth of the statement in question. Pennsylvania has so provided by statute. 42 Pa.C.S. § 8343(b)(1). *Simms v. Exeter Architectural Prods., Inc.,* 916 F.Supp. 432, 437 (M.D.Pa.1996).

*Was the Statement Substantially True?*

Defendants have admitted, by way of the apology issued on April 19, 1998, that the statement was false, in that they had no evidence that Gaming World was under investigation by the FBI on allegations of skimming $22 million from the casino at

the time the article was published or thereafter. Moreover, Armstrong admitted that her reference to the FBI in the November 13, 1997 article was a mistake. She has stated that she copied the passage used in the November 13 article from the November 8 article, and that the November 8 article was a mistake because it substituted FBI for federal regulators. (Armstrong Decl. ¶¶ 7–8.) Plaintiff has proffered evidence that there was no FBI investigation. Lorna LaGue, a White Earth Band member who began working for the tribe in 1983 and who worked for the Shooting Star as human relations manager and later tribal liaison to Gaming World and who remained at the Shooting Star until September 1997, nearly thirteen months after Gaming World was fired (LaGue Dep. at 16, 18–19, 27), testified that there was no FBI investigation into Medure resulting from the tribal resolution (LaGue Dep. at 101–03).

Defendants now argue that the statement was "substantially true" because FBI and federal regulators are similar and because there is no significant distinction between being under investigation and being under consideration for investigation. They also contend that the article did not reveal the harsh words of the actual tribal resolution. Finally, they argue that there is evidence that Gaming World was under investigation by the FBI. Plaintiff responds that: 1) there is a significant difference between reporting what some members of the tribe alleged and reporting that an investigation by the FBI was underway; and 2) Defendants' references to an FBI investigation are not related to the allegation reported in the article, but rather to a background check performed before Gaming World began managing the casino, the FBI investigation into alleged connections with organized crime that was the subject of the *US News* article, and the indictment and conviction of three members of the tribal council, Chairman Darrell "Chip" Wadena, Jerry Rawley and Rick Clark, which did not involve Medure or Gaming World in any way.

*Differences Between Article and AP Wire*

Defendants argue that the article was substantially true because there is no significant distinction between the phrase "federal regulators" (used in the AP wire) and the word FBI (used in the article), and because there is no significant distinction between saying that a governmental agency was investigating Gaming World and saying that the agency was considering whether to investigate Gaming World. However, there is a difference between unsubstantiated allegations by private individuals and the implication of criminal activity sufficient to invoke an investigation by a federal law enforcement agency.

Defendants cite a case in which a district court held that an article which reported that the plaintiff had been arrested by the FBI was substantially accurate because he had really been arrested by state police. *Robinson v. U.S. News & World Report, Inc.,* No. 88 C 7260, 1989 WL 55021 (N.D.Ill. May 11, 1989) (Defs.' Ex. 21). That case is distinguishable from this one. A far more relevant case is *St. Surin v. Virgin Islands Daily News, Inc.,* 21 F.3d 1309, 1316–17 (3d Cir.1994). In that case, false statements were made in newspaper articles that St. Surin, the head of the Department of Public Works engineering division, was the target of a federal prosecutor's investigation for trading favors for contracts and would be imminently subject to charges. The Court of Appeals concluded that these statements were not substantially true because the EPA had proposed filing administrative sanctions against St. Surin. The court held that the district court had erred by granting summary judgment for the defendants.

Defendants also argue that, if anything, the article (which used the word "skimming") was mild by comparison to the harsh words of the actual tribal resolution, which contained allegations of "pillaging, looting and purloining." (Defs.' Ex. 5.) However, they have mischaracterized the situation. Although the tribal resolution contained allegations of wrongdoing against Medure and Gaming World by members of the *tribe*, the article went farther by stating that the *FBI* was investigating the company. "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D.Pa.1983). The gist of the tribal resolution was that allegations of wrongdoing by Medure and Gaming World had been made and federal regulators had been asked to investigate. By contrast, the gist of the article in *The Vindicator* was that the FBI was actively investigating Gaming World.

Plaintiff has submitted testimony from individuals who state that the comment that Gaming World was under investigation by the FBI was significant to them. (LaGrotta Dep. at 74, 79, 106, 111–12; Antonio Dep. at 22; Lamancusa Dep. at 76–77.) A genuine issue of material fact exists as to whether people reading the article in *The Vindicator* would have taken from it the same gist and whether it had the same sting as the tribal council's resolution.

*Was There an FBI Investigation?*

Armstrong states that, while covering the trial, she

was aware that the challenged U.S. News article had reported that the FBI was investigating Medure, and [she] heard the name "FBI" on numerous occasions during the trial. [She] does not recall any evidence at trial showing that the FBI investigation described in the U.S. News article had not occurred, nor does [she] recall counsel arguing in court during the trial that the FBI investigation described in the U.S. News article had not occurred.

(Armstrong Decl. ¶ 6.) However, in her deposition, she stated that she did not hear any testimony about an FBI investigation during the trial. (Armstrong Dep. at 129–31.)

Defendants also cite portions of the testimony in the *US News* case, and they have submitted the transcript of an interview with Henry Zottola conducted by James Popkin for *US News*. (Defs.' Exs. 13–16.) They have not explained, however, how the article at issue in that case (written in 1993) concerning an alleged FBI investigation into Medure's possible involvement with organized crime figures, supports the statement that Gaming World was placed under FBI investigation for skimming $22 million from the casino, made in November 1997 relating to events that occurred in 1996.

Defendants point to testimony by three individuals to support their contention that the statement in the article was substantially true because an FBI investigation did take place. Stephen Exley was an outside auditor hired by the tribe in July 1996. He stated that he was told by a federal investigator to expect inquiries from the FBI, although he did not recall the details of the FBI inquiry and remembered only one phone call but not the matters discussed. (Exley Dep. at 8, 24–27, 56–57).

Elizabeth Foster–Anderson was a former accountant for the casino. She stated that she spoke to David Barnes of the Inspector General's office and to FBI agent "Mike" Balen. (Foster–Anderson Dep. at 8, 22–23.) However, she stated that this investigation was not in relation

to the ouster of Gaming World by the tribe, but rather related to the indictments of Wadena, Rawley and Clark. (Foster–Anderson Dep. at 40–41.) These three individuals were convicted in June 1996 of rigging a bid so that a company they owned got a contract in the construction of the Shooting Star Casino and of rigging a 1994 tribal election. (Medure Dep. at 16, 23–24.) The former event occurred before Gaming World arrived to manage the casino, and the latter event did not concern Medure or Gaming World in any way. (Medure Dep. at 25.) As the Post–Gazette reported at the time, Wadena "is now awaiting sentencing after being convicted June 24 on federal corruption charges, including bribery, conspiracy, money-laundering and misuse of tribal funds. Some of the money used to build the casino came from the federal government." (Pl.'s Ex. D.)

Frank Johnson is a CPA who worked for the tribe. He was asked questions about Medure by two agents including one from the FBI, but this occurred in October 1999. (Johnson Dep. at 8, 27, 29, 51–52). Therefore, his testimony does not demonstrate that the statement in the article concerning events in 1996 was substantially true.

Thus, none of this testimony demonstrates that the statement that Gaming World was under investigation by the FBI in August 1996 was substantially true. Finally, Defendants argue that

> Even Medure admits the existence of a federal investigation of the payment of casino money to Gaming World, quibbling only with whether Gaming World had actually done anything wrong. Medure states: "[T]he financial arrangement between Gaming World, the Shooting Star and the Tribe had previously been examined by the Department of the Interior and the FBI just a few years previously, and no improprieties

were found relating to Gaming World." (Pltff.'s Brief at 27.) The Vindicator did not report that the FBI or any other federal agency found any improprieties, only that there was an investigation, which Medure effectively admits.

(Defs.' Reply Br. at 17.)

However, the quoted section is a statement in a brief, which has no citation to the record. Therefore, it cannot be construed as an admission by Medure. Moreover, it would appear that the reference being made was to a background check that had been done prior to the time when Gaming World began managing the casino. (Medure Dep. at 14–15.)

In summary, none of the citations to the record made by the Defendants supports the argument that the FBI was investigating allegations that Gaming World had skimmed $22 million from the casino. Defendants have failed to demonstrate that the statement in the November 13, 1997 article was substantially true. Therefore, with respect to this argument, Defendants' motion for summary judgment should be denied.

*Fair Report Privilege*

Defendants argue that the fair report privilege protects the article. "The fair report privilege ... developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer." *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir.1981) (footnote omitted). The Court of Appeals described the privilege as the ability of "the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own." *Id.* at 137–38 (footnotes omitted). "The existence

and breadth of the privilege concerning reports of official or judicial proceedings are matters of law appropriate for summary disposition." *Friedman v. Israel Labour Party,* 957 F.Supp. 701, 709 (E.D.Pa.1997).

Defendants rely upon the *Friedman* case, in which newspapers published a press release issued by the Israeli government that Howard Friedman and six others were barred from entering the state of Israel because they either had a criminal background which might endanger public peace or were liable to endanger state security. The court held that the publication of this press release fell within the fair report privilege because the policy justifications for the privilege (supervisory interest of the press to inform the public about the workings of governments, the informational interest in education, and the agency rationale by which the reporter acts as agent for those who could inform themselves) were satisfied. *Id.* at 711–13.

Defendants argue that a resolution by an Indian tribe similarly falls within the privilege. *Friedman* was a case of first impression. In his seminal treatise on the subject of defamation, Judge Sack notes that "[c]ase law as to whether reports of the proceedings of foreign courts and other agencies fall within the privilege is sparse and contradictory." 1 *Sack on Defamation* § 7.3.2, at 7–22 to 7–23 (3d ed.1999). *See Lee v. Dong–A Ilbo,* 849 F.2d 876 (4th Cir.1988) (the press release of two South Korean intelligence agencies reporting the involvement of a South Korean citizen-New York resident in a North Korean spy ring and six newspapers' republication of that release were not covered by the fair report privilege), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989). There is no reported case discussing whether the privilege would extend to the resolution of an Indian tribe.

Plaintiff argues that "[t]he Tribal Resolution recites the outrageous beliefs and allegations being leveled by a vocal, political faction of the White Earth Tribe against prior tribal leaders and Medure. This is a far cry for an official report." (Pl.'s Br. at 29–30.) He also notes that Armstrong admitted that she had not even seen the tribal resolution at the time she wrote the article in question. (Armstrong Dep. at 136–42.) Therefore, she was not relying on it. In addition, Plaintiff notes that neither the AP wire nor *The Vindicator*'s summary of it even mentioned the tribal resolution, and therefore there is no evidence that Armstrong was attempting to summarize the tribal resolution in her article. These latter arguments alone are unpersuasive, because the court noted in *Medico* that a media defendant need not actually have seen and relied upon reports of official proceedings so long as the story is a fair and accurate portrayal of the events in question. 643 F.2d at 146–47 (citing *Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 275 A.2d 53, 58 (1971)).

However, the Court need not resolve the difficult question of the applicability of the fair report privilege in this case because, even assuming that the resolution of an Indian tribe falls within the privilege, Defendants did not give a fair and substantially accurate statement of it. Rather, as explained above, they changed allegations by the tribal council that federal regulators would be asked to investigate Gaming World into a claim that the FBI was actually investigating the company. The privilege is a qualified one, and it "is forfeited if the publisher steps out of the scope of the privilege or abuses the 'occasion.' This can be done by exaggerated additions, or embellishments to the account." *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586, 589 (1963). "Although it is a question of law as to whether or not [a] conditional privilege applies, it is a ques-

tion of fact as to whether or not that privilege has been abused." *Simms*, 916 F.Supp. at 436. Under Pennsylvania law, the burden to demonstrate abuse of a conditional privilege in a defamation case falls on the plaintiff. 42 Pa.C.S. § 8343(a)(7). *See Computer Aid, Inc. v. Hewlett–Packard Co.*, 56 F.Supp.2d 526, 534 (E.D.Pa. 1999) (the court denied a computer manufacturer's motion for summary judgment when genuine issues of material fact existed as to whether a contractor's press release was a fair and accurate report of the complain the contractor had filed). Plaintiff has demonstrated the existence of a genuine issue of material fact as to whether Defendants abused the privilege. Therefore, with respect to this argument, the motion for summary judgment should be denied.

*Wire Service Privilege*

Defendants argue that the passage in Armstrong's article was based upon a passage in an AP wire issued on August 14, 1996, and that it is therefore protected by the "wire service privilege." "Under the 'wire service' defense, republication of a news article published by a recognizable and reliable source of daily news cannot constitute defamation, unless the story was reproduced in a negligent manner." *Friedman*, 957 F.Supp. at 715 n. 21.

Plaintiff notes that Pennsylvania has never adopted this privilege. In *Friedman*, the court stated that "the wire service defense is currently unavailable under Pennsylvania law." *Id.* Defendants argue that this statement in *Friedman* is dictum. However, they have cited no authority to demonstrate that the courts of Pennsylvania have applied the wire service privilege.

In addition, they argue that, because the newspaper did not produce the actual wire report upon which it supposedly relied, the court in *Friedman* could not determine whether there existed a genuine issue of material fact as to the applicability of the wire service defense and could not definitively determine if the paper substantially altered the report or unreasonably relied upon it when writing its article. Although this is a true statement, in this case the AP wire has been supplied and, as discussed above, Plaintiff has demonstrated the existence of a genuine issue of material fact as to whether Armstrong substantially altered the words in materials that preceded her article when writing the November 13, 1997 article. *See Winn v. Associated Press*, 903 F.Supp. 575, 579 (S.D.N.Y. 1995), *aff'd mem.*, 104 F.3d 350 (2d Cir. 1996). Moreover, it is not clear that the wire service privilege could be applied to the November 13, 1997 article in any event, because it was not a "republication" of a news article from the AP wire. *The Vindicator* did republish the information from the AP wire on August 14, 1996, in an article without a byline and the notation "AP" to indicate its source. (Defs.' Ex. 79.) That article did not contain the erroneous statement that Gaming World had been placed under investigation by the FBI and Plaintiff does not contend that he was defamed by that article.

Defendants point to another AP wire issued that same date which contained the statement that "[a] legal adviser to the tribe, former federal judge Miles Lord, said the Federal Bureau of Investigation, the Internal Revenue Service and the Interior Department are expected to begin their own investigations by early September." (Defs.' Ex. 28.) However, Armstrong's testimony was that she based her article on the AP story (Defs.' Ex. 79), which did not contain this statement, not on the AP wire. Indeed, she testified that she obtained the AP wire in February 1998 when her editor inquired about her source for the article. (Armstrong Decl. ¶¶ 14–15.) Moreover, even this statement differs significantly from what Armstrong wrote in her article: the AP wire stated that

Miles Lord said that the FBI was expected to begin an investigation in September 1996, but Armstrong wrote in November 1997 that Gaming World was under an FBI investigation. Therefore, with respect to this argument, the motion for summary judgment should be denied.

*Of and Concerning Plaintiff*

For a statement to be actionable by a plaintiff, it must be shown that the allegedly defamatory statement was "of and concerning" the plaintiff. *New York Times Co. v. Sullivan,* 376 U.S. 254, 267, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Whether the complaint alleges facts sufficient reasonably to connect the libel to the plaintiff is a question for the court, although the ultimate determination of whether the libel actually applies to the plaintiff is for the jury." 1 *Sack on Defamation* § 2.9.3, at 2–120. *See* Restatement (Second) of Torts § 617.

Defendants contend that the statement was not of and concerning Medure because it was about Gaming World. Although he is the president of Gaming World, they argue that he is not "the company." The cite *American Benefits Corp. v. Administrative Consultants, Inc.,* a case in which the president and the chief executive officer (the Generalis) of a company (ACI) brought a defamation claim based on a letter stating that ACI "does not have the necessary financing for" a project, that "the entire program is in danger of failing" and that "ACI is small, basically unprofitable company." No. 87 CIV. 1797(JFK), 1989 WL 129495, at *8 (S.D.N.Y. Oct. 26, 1989). The court held that the Generalis failed to demonstrate that the defamatory statements were "of and concerning" them because the "remarks were made 'of and concerning' ACI. The Generalis are not mentioned at all. In this case, then, the Generalis cannot recover unless the alleged defamatory matter imputes to them 'personal misconduct or reprehensible character.'" *Id.* at *10. Defendants also cite a case in which two individuals brought a libel action against a newspaper concerning a housing project and the Pennsylvania Supreme Court parenthetically noted, with respect to a separate action brought by the housing association for articles criticizing the physical condition of the housing premises, that "[w]ords criticizing a corporation, without more, are not defamatory of a person connected with it." *Volomino v. Messenger Publ'g Co.,* 410 Pa. 611, 189 A.2d 873, 874 n. 1 (1963).

In this case, however, Medure was mentioned by name and identified as the president of Gaming World. In addition, Plaintiff has submitted testimony from individuals in the community that the statement was understood by them to reflect on him. (Antonio Dep. at 38–40; LaGue Dep. at 76–77; Lamancusa Dep. at 75–78; LaGrotta Dep. at 25, 62.) This is sufficient to send this issue of material fact to the jury. *See Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 925 (2d Cir.1987). Therefore, with respect to this argument, the motion for summary judgment should be denied.

In conclusion, it is recommended that the Motion for Summary Judgment filed by Defendants be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: Aug. 28, 2000.

## MAGISTRATE JUDGE'S AMEND-ED REPORT AND RECOM-MENDATION

### I. *RECOMMENDATION*

It is recommended that the Motion for Summary Judgment filed by Defendants be denied.

### II. *REPORT*

On August 28, 2000 a report and recommendation was filed recommending that Defendants motion for summary judgment be denied. Defendant filed objections to the report and recommendation to which Plaintiff responded and Defendant filed a reply memorandum. After review of the objections, Plaintiffs' response and the reply as well as the memoranda submitted by the parties and the relevant exhibits and depositions this amended report and recommendation is being filed.

Plaintiff Angelo Medure brings this action for defamation against Defendants The Vindicator Printing Company, publisher of *The Vindicator*, a daily newspaper based in Youngstown, Ohio, and *Vindicator* reporter Cory Armstrong. "The case arises out of the Attorney General shall investigate activities associated with gaming authorized by this chapter which may be a violation of Federal law." § 2716(c).

#### *US News Article and Lawsuit*

In August 1993, *U.S. News and World Report* (*US News*) published an article by James Popkin titled "Gambling with the Mob? Wise guys have set their sights on the booming Indian casino business." (Medure Dep. at 58, 76 & Ex. 5; Defs.' Ex. 91.) The article stated that the Federal Bureau of Investigation (FBI) was investigating Medure for alleged connections to the Mafia, and the article implied that the Mafia, through Medure and Gaming World, was attempting to infiltrate Indian gaming.

On September 24, 1993, Medure and Gaming World brought suit against Popkin and *US News* in the Court of Common Pleas of Lawrence County, Pennsylvania (the "*US News* case"). *The Vindicator*'s New Castle bureau covered this case from its inception. (Defs.' Exs. 71, 72, 74, 75, 77, 80–87.) Cory Armstrong joined the staff of *The Vindicator* in January 1994 as a reporter. (Armstrong Decl. ¶ 3; Armstrong Dep. at 12.) In January 1996, Armstrong took over the New Castle bureau of *The Vindicator* and she was assigned to cover the *US News* defamation trial by her immediate supervisor, Cynthia Rickard. (Armstrong Dep. at 13, 18, 24, 46, 60–61; Paglia Dep. at 14, 31.) As explained below, the article at issue in this case was published on the day after a settlement was reached that ended the *US News* case in November 1997.

#### *Medure v. New York Times*

Meanwhile, in June 1994, Medure filed a defamation claim in this court against The New York Times Company and its subsidiary, The Press Democrat, arising out of two newspaper articles published in the summer of 1993 in the *Santa Rosa Press Democrat*, a Santa Rosa, California newspaper owned and published by the Times. In that action, *Medure v. New York Times Co.*, 60 F.Supp.2d 477 (the *NY Times* case), Medure alleged that articles published on June 13, 1993 and August 18, 1993, which were about his proposed development of a casino at the Fountaingrove County Club in Santa Rosa and which discussed the Shooting Star Casino at length, defamed him by linking him to known organized crime figures. (Defs.' Ex. 12.) As explained below, that case ended when Judge Cohill granted summary judgment for the defendants and the parties settled during the appeal.

*Tribal Resolution*

On August 12, 1996, the five-member tribal council of the White Earth Band passed a resolution that terminated the tribe's contract with Gaming World, ordered that "Angelo Medure/Gaming World be immediately and summarily removed" and ordered that Medure "be stripped of all authority" in connection with "the operation, maintenance, supervision, finances and financial affairs of the Shooting Star Casino." (Defs.' Ex. 5 at 3.) The resolution accused Medure of working with a previously constituted tribal council to "fleece the casino and the people of White Earth," and accused him of "looting of the casino treasury," and it recommended that litigation be initiated to "recover the purloined monies." (*Id.* at 2–3.) The resolution estimated that the amount owed to the White Earth Band from actions by Medure and the previous tribal council was approximately $22 million. The Resolution concluded:

There are, of course, millions of dollars unaccounted for by prior tribal counsel and by Angelo Medure/Gaming World, which will be the subject of an ongoing search by auditors, accountants, attorneys and employees of the new tribal council and, *hopefully, by state and federal officials.*

(Emphasis added.)

Barbara Lueben, the marketing manager for the casino, testified that she and other Gaming World representatives were summoned to appear before the tribal council that night, where the council read the resolution to them and ordered them to leave. She compared the scene that night to "a lynching" and she stated that she was forced to leave the casino quickly.

She drove to Medure's house and told him what happened. (Lueben Dep. at 6–7, 53–58.) Medure was at home that night when Lueben brought this news to him. (Medure Dep. at 33, 35.) He never returned to the casino. (Medure Dep. at 34.)

Erma J. Vizenor, Secretary–Treasurer of the tribal council (Vizenor Decl. II [1] ¶ 1), states that, following the adoption of the tribal resolution on August 12, 1996, the council contacted and sent a copy of the resolution to the following agencies: the NIGC; the United States Attorney, Department of Justice; the Office of the Inspector General, Department of the Interior; and the Minnesota Agency, BIA. (*Id.* ¶ 4.) She further states that:

Following these contacts, Tom Foley of the [NIGC] contacted the Tribal Council to arrange a meeting with the Tribal Council.

In September or October 1996, the Tribal Council met at the Shooting Star Casino with Tom Foley and another representative of the NIGC. The Tribal Council informed the NIGC representatives of the Tribal Council's position with respect to the monies taken by Gaming World International. The Tribal Council also gave the NIGC representatives copies of documents and reports prepared by the accountant hired by the Tribal Council to investigate the monies paid the Gaming World International. The NIGC representatives asked questions of the Tribal Council concerning the management contracts between the tribe and Gaming World International.

During this meeting, the Tribal Council requested the NIGC's assistance in recovering the money paid to Gaming

---

1. Defendants have submitted two declarations by Erma Vizenor. The first (Vizenor Decl. I) constitutes Exhibit 4 in support of their motion for summary judgment and concerns the arbitration proceeding. The second (Vizenor Decl. II) constitutes Exhibit 9 and concerns the tribal council's contacts with various agencies after terminating the contract with Gaming World.

World International from the Shooting Star Casino.

(*Id.* ¶¶ 5–7.)

Gaming World submitted a demand for commercial arbitration against the tribe, claiming lost income from the remainder of its five-year contract. (Defs.' Ex. 6; Medure Dep. at 45; Vizenor Decl. I ¶ 3.) The White Earth Band counterclaimed for $22 million, including "excess distribution of casino profits" for a total of $20.8 million including interest, Medure management salaries for a total of $349,000 and salaries of other Gaming World managers for a total of $677,000. (Defs.' Ex. 7 at 2; Vizenor Decl. I ¶ 4.) As of October 1999, the arbitration remained unresolved. (Medure Dep. at 99.)

### US News Case Goes to Trial

Trial began in the *US News* case on November 3, 1997. Cory Armstrong attended much of the trial on behalf of *The Vindicator*. (Armstrong Decl. ¶ 4; Armstrong Dep. at 76.) Plaintiff's brief asserts that, at the trial, he introduced evidence refuting the existence of any FBI investigation, and he stated that he had successfully passed numerous background checks by both the FBI and the BIA, the predecessor to the NIGC. (Pl.'s Br. at 4.) However, he does not identify any support for this statement in the record. It is noted that, in his deposition, Plaintiff testified that the BIA approved Gaming World's contract with the White Earth Band to manage the Shooting Star Casino, but he did not testify that he had successfully undergone background checks by the FBI. (Medure Dep. at 14–15.) His brief also states that he introduced evidence that the false FBI accusation cost him and Gaming World economic damages in excess of $50 million.

Armstrong was present at the courthouse during settlement negotiations. (Armstrong Dep. at 156.) The case settled on November 12, 1997, after Medure's di-rect examination (Medure Dep. at 62; Armstrong Decl. ¶ 5), and a joint statement was issued on December 1, 1997. (Medure Dep. at 70 & Exs. 6–7.) The statement read as follows:

> On August 23, 1993, *U.S. NEWS & WORLD Report* published an article titled "Gambling with the mob? Wise guys have set their sights on the booming Indian casino business." A portion of that article named Angelo Medure, the president and chief executive officer of Gaming World International Ltd. Approximately one month later, Mr. Medure and Gaming World filed a complaint against *U.S. News* in New Castle, Pa., claiming that the article was defamatory as to both Mr. Medure and Gaming World by falsely implying that they were associated with organized crime. That action has now been settled. In publishing the article, *U.S. News* did not intend to imply that either Mr. Medure or Gaming World was involved in any criminal activity or that they knowingly had done business or otherwise engaged in any improper activity or relationship with any member of organized crime, and the article should have not have been read to suggest otherwise.

(Defs.' Ex. 92.)

Armstrong was given a copy of the statement which *US News* agreed to publish and was informed by a "reliable source" that the settlement included a substantial monetary payment to Medure. (Armstrong Dep. at 156, 158–160.) The specific terms of the settlement are confidential. Armstrong asked Medure if he wanted to make a comment for purposes of the article, but Medure declined. (Armstrong Dep. at 164.)

### Vindicator Articles About the Trial

On January 30, 1997, Cory Armstrong wrote her first article for *The Vindicator* about the *US News* case, which was then

in the pretrial stage. The article stated that:

> Medure runs Gaming World International Ltd. in Ellwood City. At the time, the company had been managing the Shooting Star Casino for the White Earth Band Indian tribe in Minnesota.
>
> Gaming World was fired in August 1996, however, after the tribe accused it of taking $22 million in profits from the casino. Federal regulators have been looking into the allegations, although Medure has denied any wrongdoing.

(Defs.' Ex. 80.)

On November 3, 1997, the date trial began, Armstrong wrote an article about jury selection, which included a recap of the firing of Gaming World. She repeated the discussion quoted above from the January 30, 1997 article. (Defs.' Ex. 82; Armstrong Decl. ¶ 11.) On November 4 and November 5, 1997, Armstrong's articles about the trial stated that Gaming World was "fired amid allegations that it took $22 million in profits from the casino." (Defs.' Exs. 83–84; Armstrong Decl. ¶¶ 9–10.) Armstrong did not attend the proceedings on November 5, so no article appeared on November 6. (Armstrong Dep. at 76, 100.)

On November 8, 1997, *The Vindicator* published another article about the defamation trial. This article contained the recap paragraph that had been used in the November 3 article, but the phrase "federal regulators" was changed to "FBI" so that it read as follows: "The company has since been fired and placed under FBI investigation for allegedly skimming $22 million from the casino." (Defs.' Ex. 85 at 2.)

On November 13, 1997, *The Vindicator* published the article at issue, titled "Medure, magazine settle suit." In the article, Armstrong reported that the parties had settled the defamation suit and that they had issued a joint statement that *US News* "did not intend to imply that either Mr. Medure or Gaming World was involved in any criminal activity or that they knowingly had done business or otherwise engaged in any improper activity or relationship with any member of organized crime, and the article should not have been read to suggest otherwise." (Defs.' Ex. 87 at 2.) The article included following paragraph:

> At the time, Gaming World managed the Shooting Star Casino on a Minnesota Indian reservation. The company has since been fired and placed under FBI investigation on allegations of skimming $22 million from the casino.

(Defs.' Ex. 87.) The article was reviewed by Tom Wills, the night editor at *The Vindicator*, and published as written. (Paglia Dep. at 19–20.)

Armstrong stated that her reference to the FBI in the second paragraph quoted above was a mistake. She has stated that she copied the passage used in the November 13 article from the November 8 article, and that the November 8 article was a mistake and had been derived from prior *Vindicator* articles. (Armstrong Decl. ¶¶ 7–8.) Ultimately, she traced the January 30, 1997 passage about "federal regulators" back to an August 14, 1996 article published in *The Vindicator*, but not written by her. (Armstrong Decl. ¶¶ 13–14.) The August 14, 1996 article opened with the sentence: "Federal gambling regulators will examine allegations that an Ellwood City management company took more profits than allowed at an Indian tribe's casino in Minnesota." (Defs.' Ex. 79.) It stated that "Michael Cox, general counsel for the [NIGC] in Washington, said the agency will examine the dispute and decide whether to open an investigation." (*Id.*)

This article was based upon an Associated Press (AP) dispatch, also issued on August 14, 1996, that reported that the NIGC would examine the dispute between

Gaming World and the tribe and decide whether to open an investigation. (Defs.' Ex. 27; Armstrong Decl. ¶ 15.) Thus, in addition to changing the phrase "federal regulators" to "FBI," Armstrong's article also stated that an active investigation was underway, rather than stating that federal regulators had been asked to investigate the dispute. Neither Armstrong nor anyone else at *The Vindicator* checked to see whether, between August of 1996 (when the AP wire was issued) and November of 1997 (when her story was written), the NIGC ever actually looked into the allegations or placed Medure under investigation. (Armstrong Dep. at 140–43.)

Armstrong states that she

does not know exactly what caused her, when she was writing the November 8 article about the U.S. News trial, to refer to the "FBI" instead of "federal regulators," except that it was an inadvertent error. [She] did not realize the error when she was writing the November 8 article or when she was writing the November 13 article.

(Armstrong Decl. ¶ 12.) She further states that she "did not actually entertain serious doubts about the truth or accuracy of those passages. [She] was not conscious of any mistake in these passages when she wrote them or when the Vindicator circulated them in the newspaper." (Armstrong Decl. ¶ 16.) Armstrong notes that no one told her there was any mistake in any article until after the November 13 article was published. (Armstrong Decl. ¶¶ 17–21.) Finally, she states that she did not "bear any ill will or hostility toward [Medure], nor did she write any article about him with the desire to injure him or with a motive to injure him." (Armstrong Decl. ¶ 23.)

### The Aftermath

On November 14, 1997, the day after the article appeared, Medure called Armstrong to complain. However, he declined to identify the specific portion of the article to which he objected. (Medure Dep. at 111; Armstrong Dep. at 171–72.) He stated that "I knew I was going to be suing [*The Vindicator*] then." (Medure Dep. at 113.) He had no further communication with Armstrong or anyone else from *The Vindicator.* (Medure Dep. at 117.)

Over the next several weeks, Armstrong and Richard DiSalle, Medure's attorney, exchanged messages but were unable to speak to each other. (Armstrong Dep. at 172, 174–75.) In a memo prepared for her supervisor on February 2, 1998, Armstrong stated that, after her second unsuccessful attempt to speak to DiSalle, "I dropped the issue." (Armstrong Dep. Ex. 14; see Armstrong Dep. at 175.) On January 30, 1998, DiSalle sent a letter to Betty H. Brown Jagnow, President/Publisher of *The Vindicator.* He wrote that:

Our firm has been retained by Angelo Medure and Gaming World International, Ltd. to pursue an action for defamation against *The Vindicator* and Cory Armstrong in connection with an article titled "Medure, magazine settle suit" which was published in *The Vindicator,* Volume 109 Number 74 on November 13, 1997. The article contains false and malicious statements regarding Mr. Medure and his company.

We have tried to contact the author of the article, Ms. Cory Armstrong, numerous times without success. If you have insurance for defamation claims, please put your carrier on notice of this claim and request that a representative contact me. Otherwise, please have your attorney contact me directly to discuss this claim.

(Defs.' Ex. 17.)

Anthony Paglia, Senior Regional Editor for *The Vindicator* since 1989 (Paglia Decl. ¶ 1; Paglia Dep. at 7), states that this letter from DiSalle came to his attention

on February 2, 1998, at which time he did not know what in the article was claimed to be a falsehood. (Paglia Decl. ¶ 8; Paglia Dep. at 36.) With the assistance of counsel for *The Vindicator,* Paglia investigated and discovered that Armstrong had made a mistake in reporting that Gaming World had been placed under FBI investigation. (Paglia Decl. ¶ 9; Paglia Dep. at 36–39.)

Mr. Paglia states that:

Vindicator management then decided it would publish an apology, explaining that it had no information that the FBI investigation described actually had happened. The Vindicator could not categorically say that no such investigation had occurred because, at that time, the Vindicator did not know whether there actually had been such an investigation. The Vindicator decided to show the proposed apology to Mr. Medure's counsel in advance of publication for Mr. Medure's input.

(Paglia Decl. ¶ 10.) On February 27, 1998, counsel for *The Vindicator* sent a letter to Attorney DiSalle, which included the proposed apology. (Defs.' Ex. 18.) On April 6, 1998, Attorney DiSalle responded with a counter-proposed apology. (Defs.' Ex. 19.)

Nevertheless, *The Vindicator* decided to proceed with publishing the apology that it originally had proposed. The apology was published on page 2 of the Sunday, April 19, 1998 issue of *The Vindicator.* (Paglia Decl. ¶ 11.) The apology stated as follows:

**GETTING IT RIGHT**

A Nov. 13, 1997, story incorrectly reported that the FBI was investigating Gaming World International, a management company owned by Ellwood City businessman Angelo Medure, in connection with an Indian casino the company operated in Minnesota. The Vindicator had no information that either Gaming World or Medure had been under the FBI investigation described. The Vindicator apologizes for the error.

(Defs.' Ex. 88.) Mr. Paglia states that "[a]t no time did the Vindicator publish any article about Mr. Medure with a desire or motive to injure him." (Paglia Decl. ¶ 12.) On October 19, 1998, Medure and Gaming World initiated this action for defamation arising out of the November 13, 1997 article.

*Summary Judgment in N.Y. Times Case*

On August 20, 1999, Judge Cohill entered an order granting the defendants' motion for summary judgment in the *NY Times* case. He concluded that "Angelo Medure was a limited purpose public figure for purposes of all statements complained of in the newspaper articles at issue, and that he has failed to present clear and convincing evidence from which a jury could find that any of the statements complained of were made with actual malice." *Medure v. The New York Times Co.,* 60 F.Supp.2d 477, 482 (W.D.Pa. 1999). Medure appealed, but the appeal was dismissed by the Third Circuit on March 20, 2000 when the parties settled the case.

*Procedural History*

On October 19, 1998, Medure and Gaming World initiated this case by filing a complaint in the Court of Common Pleas of Lawrence County, Pennsylvania. Count I alleged that the Defendants defamed Medure and Gaming World in the November 13, 1997 article by imputing criminal activity to them. Count II alleged that neither Medure nor Gaming World was a public figure nor was involved in any public controversy and that Defendants' conduct was malicious, wanton, willful, reckless intentional, and outrageous, and therefore the complaint requested punitive damages. (Compl. ¶¶ 24, 28.)

On November 17, 1998, Defendants removed the action to this Court on the basis of diversity jurisdiction. On October 19, 1999, an order was entered granting the stipulated dismissal of Gaming World and all claims asserted on its behalf as a plaintiff, as well as any and all claims by Medure for economic injuries including injuries to his "business dealings," present and future financial losses and damage and "economic losses, including lost income and loss of earning capacity." (Doc. # 8.) On January 31, 2000, Defendants filed a Motion for Summary Judgment.

### Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying evidence which shows the lack of a genuine issue of material fact. Once that burden is met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty–Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendants argue that: 1) Medure is a limited purpose public figure for purposes of reporting about the management of the Shooting Star Casino, as Judge Cohill determined in the *NY Times* case; 2) he has failed to produce clear and convincing evidence of actual malice; 3) he has not demonstrated that the article was false because Gaming World was fired amid allegations of improper behavior (the article was far less severe than the actual allegations made by the tribe) and whether it was the FBI or federal regulators who were investigating does not make a substantial difference; 4) the fair report privilege protects a substantially accurate statement based on the tribal resolution; 5) *The Vindicator* derived its report from an AP dispatch so that in conveying its essence the paper was under no duty to verify the contents; and 6) the statement is not "of and concerning" Medure, but is about Gaming World and although he is the president, he is not the company.

Plaintiff argues that: 1) he is not a limited purpose public figure because the controversy that was the subject of the article was a private matter (a defamation suit between private parties); 2) actual malice is an issue of fact and Armstrong recklessly disregarded the truth in her article; 3) the article was neither true nor substantially true, and Defendants have not met their burden of demonstrating that it was true; 4) the fair report privilege does not apply because Armstrong did not read the tribal resolution at the time she wrote her article, the tribal resolution was not an official or governmental report for purposes of the privilege, and even if the privilege applied she abused it by failing to give a fair and substantially accurate report of what it said; 5) the "wire service privilege" has not been adopted in Pennsylvania and even if it applied the material must be republished without substantial changes; and 6) the issue of whether the comment referred to Medure is for the jury to decide, because reasonable people believed that it did.

### Public or Private Figure

Determining whether a plaintiff in a defamation case is a public or private figure is a question of law for the court to decide. *Marcone v. Penthouse Int'l Magazine for*

*Men,* 754 F.2d 1072, 1081 & n. 4 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985); *Iafrate v. Hadesty,* 423 Pa.Super. 619, 621 A.2d 1005, 1007 (1993).[2] In a defamation case, the question of whether the plaintiff is a public or private figure is an important distinction, because the Supreme Court has held that a media defendant has a constitutional privilege for the publication of defamatory falsehoods concerning public figures, and that a plaintiff alleging such defamation is required to show clear and convincing evidence of "actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (constitutional protection for defamation of public official); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (constitutional protection for defamation of public figure). Actual malice requires that a false statement be made "with knowledge that it was false or with reckless disregard for whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710.

On the other hand, a private figure plaintiff allegedly defamed in speech of private concern need only demonstrate simple fault on the part of the defendant to recover damages, including punitive damages. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 764, 774, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). However, when the plaintiff is a private figure but the speech is of public concern, the quantum of proof depends upon the type of damages sought—simple fault for actual damages, but actual malice for presumed or punitive damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The Supreme Court has identified two types of public figures for purposes of defamation: all purpose public figures, such as politicians, who are widely recog-

nized, and limited purpose public figures, who may not be well known on every issue but who are sufficiently involved in a particular area to be considered as public figures for that purpose. *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997. "Such limited public purpose figures have usually 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Schiavone Constr. Co. v. Time, Inc.,* 847 F.2d 1069, 1077 (3d Cir.1988) (quoting *Gertz,* 418 U.S. at 345, 94 S.Ct. 2997). *See Rutt v. Bethlehems' Globe Publishing Co.,* 335 Pa.Super. 163, 484 A.2d 72, 80 (1984); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky,* 769 F.2d 942, 949 (3d Cir. 1985).

In *Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the Supreme Court held that a plaintiff who chose not to appear before a grand jury investigating the activities of Soviet intelligence agents in the United States and who was thereafter cited for contempt was not a limited purpose public figure for purposes of comment on his connection with or involvement in Soviet espionage in the 1940s and 1950s. The Court stated that "the mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public-figure status." *Id.* at 157, 99 S.Ct. 2701. The Court further stated that:

> Petitioner's failure to appear before the grand jury and citation for contempt

**2.** As explained below, Pennsylvania law should be applied in this case.

no doubt were "newsworthy," but the simple fact that these events attracted media attention also is not conclusive of the public figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 44, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone,* however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*.

*Id.* at 167–68, 99 S.Ct. 2701.

In *McDowell,* the Court of Appeals held that an architect who participated in numerous publicized and controversial building projects, one of which he had successfully bid upon despite knowing its controversial nature, was a limited public purpose figure as to his participation in those projects. *Id.* at 949–50. Similarly, in *Marcone,* the court held that the plaintiff, an attorney who represented members of notorious motorcycle gangs and who also had social contacts with their members, was a limited public purpose figure on the issue of his alleged participation in a drug conspiracy with those members (he had been indicted but the indictment was subsequently dismissed). 754 F.2d at 1083.

In *Schiavone,* the court held that a construction company and its majority owner were limited public purpose figures. The court cited the fact that the plaintiffs: 1)

campaigned for President Reagan; 2) conducted a private investigation of the Special Prosecutor and other investigators of the Secretary of Labor; 3) wrote numerous letters to the editor in various national and local publications complaining about how the Secretary was being treated; 4) bragged in their promotional literature about their close ties with the Secretary; and 5) worked exclusively on public projects. 847 F.2d at 1078.

In making the determination of whether a plaintiff is a limited purpose public figure, "[t]he court must consider (1) whether the alleged defamation involves a public controversy, and (2) the nature and extent of plaintiff's involvement in that controversy." *McDowell,* 769 F.2d at 948 (citing *Marcone,* 754 F.2d at 1082). In addition, the court must "consider whether the statements complained of relate to the public issue as we have defined it. This is a necessary step, since statements 'wholly unrelated to the controversy . . . do not receive *New York Times* protection.'" *NY Times,* 60 F.Supp.2d at 486 (quoting *Waldbaum,* 627 F.2d at 1298).

Defendants contend that Judge Cohill's conclusion that Medure was a limited purpose public figure in the *NY Times* case controls Medure's status for purposes of this case, based on: 1) the doctrine of "law of the district"; 2) the doctrine of collateral estoppel; or 3) the reasoning of that case. Plaintiff argues that the doctrine of collateral estoppel may not be applied in this case because Defendants did not raise it earlier, and that this action differs from the *NY Times* case because the controversy is not the same and is, in fact, a private controversy.

*Law of the District*

Defendants cite two old district court cases to support the proposition that "judges sitting in the same court should not overrule each other on similar issues of

law." (Defs.' Mem. Supp. Objections at 17) (citing *In re Terzich,* 153 F.Supp. 651, 652–53 (W.D.Pa.1957); *United States v. Firman,* 98 F.Supp. 944, 946 (W.D.Pa. 1951)). The Court of Appeals has held, however, that

> there is no such thing as "the law of the district." Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior "resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another."

*Threadgill v. Armstrong World Indus., Inc.,* 928 F.2d 1366, 1371 (3d Cir.1991) (quoting *State Farm Mut. Auto. Ins. Co. v. Bates,* 542 F.Supp. 807, 816 (N.D.Ga.1982)) (footnote omitted).

Thus, the Court is not bound to follow Judge Cohill's decision based upon the doctrine of "law of the district." However, for the reasons that follow, Plaintiff should be deemed a limited purpose public figure for purposes of a public controversy in the article based upon the reasoning of Magistrate Judge Caiazza and Judge Cohill in the *NY Times* case. Therefore, the Court need not address Defendants' alternative argument that this issue should be resolved based on the doctrine of collateral estoppel.[3]

In the *NY Times* case, Judge Cohill noted that:

The Report and Recommendation concludes that Medure is a limited purpose public figure "with regard to the limited subject matter of the establishment and management of Indian gaming facilities, as well as Medure's qualifications regarding the same." R & R at III(3). We note that no objections have been raised to this determination and will adopt it as the opinion of the Court. 60 F.Supp.2d at 484.

Magistrate Judge Caiazza, in his report and recommendation dated August 3, 1998, stated that:

> The first article discusses Medure's involvement in opening a casino in Santa Rosa, Medure's management of the Shooting Star casino in Minnesota, and infiltration of Indian casinos by organized crime.... The establishment of a gaming facility in Santa Rosa is a matter of concern to the readership of the *Press Democrat,* and both parties agree that the creation of a gambling facility generates intense controversy. Members of the community would also be interested in relevant information regarding the person who is involved in opening the facility and who would eventually manage the facility. Therefore, the court finds that the controversy at issue in the first article for purposes of determining whether Medure is a limited purpose public figure is the Plaintiff's involvement in the opening and management of an Indian gaming facility in Santa Rosa, including relevant information regarding

---

**3.** The collateral estoppel argument presents a number of difficulties, including: 1) Defendants did not raise it in their answer pursuant to Fed.R.Civ.P. 8(c), nor did they amend their answer to include this affirmative defense; 2) they did not raise it in their motion for summary judgment, but only in their objections to the report and recommendation dated August 28, 2000; 3) the issues in this case may not be identical to the issues in the previous case;

and 4) Defendants have not cited any case in which collateral estoppel was applied to the issues of the existence of a public controversy or whether an individual is a limited purpose public figure, perhaps because Supreme Court and Third Circuit precedent require the Court to "perform a case-by-case determination, scrutinizing the nature and scope of the plaintiffs' involvement in the controversy." *Schiavone,* 847 F.2d at 1078.

his general involvement in Indian gaming facilities.

The second article discusses Medure's ties with organized crime, his non-gaming business activities, and Medure's continuing interest and management of Indian casinos. Medure argues that the public controversy involved in the second article should be limited to the controversy discussed in the first article. This court disagrees.

It is undisputed that at the time of the second article Medure remained interested in establishing Indian gaming facilities in three counties within the *Press Democrat* readership area. At the time of the second article, therefore, the establishment of Indian gaming facilities in these areas remained a controversial public issue. The primary thrust of the second article, however, concerned Medure's connection with organized crime as originally reported in the U.S. News article. Neither party disputes that the issue of organized crime is a matter that generates public interest and controversy.

Therefore, the court determines that the controversy at issue in the second article for purposes of determining whether Medure is a limited purpose public figure is Medure's continuing involvement in the opening of Indian gaming facilities in the *Press Democrat*'s readership area, including relevant information concerning Medure's general involvement in Indian gaming facilities. In addition, the second article raises an issue of public concern because it discusses organized crime and its infiltration in Indian casinos.

(R & R *NY Times* case at 6–7.)

Thus, the "controversy at issue" in the first article was Medure's opening and management of an Indian gaming facility in Santa Rosa, California, and the controversy at issue in the second article was his continuing involvement in opening Indian gaming facilities in that area of the country, including relevant information concerning his general involvement in Indian gaming facilities, and an issue of organized crime and its infiltration in Indian casinos. Although neither of those controversies is exactly the same as the controversy in *The Vindicator* article, they are very similar to the second controversy discussed in the article.

As Magistrate Judge Caiazza recognized in the *NY Times* case, more than one "controversy" can exist within a single newspaper article. In this case, the first portion of the article was a report that Medure and *US News* had settled a defamation case. Medure raises no defamation claim with respect to this controversy. However, the article then proceeded to discuss Medure's role in managing the Shooting Star Casino in Minnesota and the circumstances surrounding the termination of his company, Gaming World, from that management contract. It was in this section of the article that Armstrong stated that Gaming World had been "placed under FBI investigation on allegation of skimming $22 million from the casino." Although Plaintiff argues that the "controversy" for purposes of the entire article was the settlement of the defamation suit, it is not the discussion of the settlement in the article that Plaintiff challenges as defamatory. He challenges the statement that he had been placed under FBI investigation on allegations of skimming 22 million dollars from the casino.

*Public Controversy*

The Court of Appeals has approvingly cited the following description of public controversy:

A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or

some segment of it in an appreciable way. The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants. *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.1980) (citation and footnote omitted), *cited in Marcone,* 754 F.2d at 1083. The fact that an industry is high-profile and highly regulated provide support the conclusion that individuals who enter that industry have thrust themselves into a public controversy. *See Silvester v. American Broadcasting Cos., Inc.,* 839 F.2d 1491, 1497 (11th Cir.1988) (plaintiffs who held positions of prominence in highly-regulated jai alai industry had thrust themselves into a public controversy); *Mosesian v. McClatchy Newspapers,* 233 Cal.App.3d 1685, 285 Cal. Rptr. 430, 440 (1991) (applicant for horse racing license became involved with the controversial issues of public concern of horse racing and gambling); *Harris Nursing Home, Inc. v. Narragansett Television, Inc.,* No. 95–52–M.P., 1995 WL 865486 (R.I. Oct.30, 1995) (a corporation that owned a nursing home "engaged in a closely regulated public health industry" and was thus a public figure for purposes of reporting about its nursing home service) (Defs.' Ex. 20.).

As Magistrate Judge Caiazza and Judge Cohill noted in the *NY Times* case, Medure has a long history of opening and managing Indian gaming facilities, an issue of concern to the public. As described above, the industry of Indian gambling is highly regulated by the NIGC. Furthermore, reports of the termination of Gaming World's management contract with the tribe were featured not only in *The Vindicator,* but also in *The Wall Street Journal* and other newspapers in Minnesota, North Dakota, Pittsburgh and New Castle. (Defs.' Exs. 48–54.)

Plaintiff has not argued that his management of the Shooting Star Casino and the termination of Gaming World's management contract do not constitute public controversies. Rather, he contends that the article in *The Vindicator* concerned only the settlement of his defamation suit against U.S. News. As explained above, that argument does not reflect the content of the entire article.

Thus, there was a public controversy concerning Plaintiff's role in managing the Shooting Star Casino and the termination of Gaming World's contract. In addition, the fact that Gaming World was no longer involved in the management of the Shooting Star Casino on November 13, 1997 does not change the result. *See Street v. National Broadcasting Co.,* 645 F.2d 1227, 1235 (6th Cir.1981) ("once a person becomes a public figure in connection with a particular controversy, that person remains a public figure thereafter for purposes of later commentary or treatment of *that controversy.*")

Plaintiff injected himself into the public controversy by entering the highly-regulated and small industry of individuals who manage Indian gaming facilities, including the Shooting Star Casino. A number of courts have stated that when a plaintiff has access to channels of effective communication, that fact supports the conclusion that he is a limited purpose public figure. *Wells v. Liddy,* 186 F.3d 505, 534 (4th Cir.1999), *cert. denied,* 528 U.S. 1118, 120 S.Ct. 939, 145 L.Ed.2d 817 (2000). Plaintiff had access to the media: on August 13, 1996, Gaming World issued a press release in which it responded to the tribe's allegations in connection with its ouster from managing the Shooting Star Casino the previous day. (Medure Dep. at 40–41 &

Ex. 2; Defs.' Ex. 22.) *See also* Defs.' Ex. 34 (August 18, 1993 article in the *New Castle News* in which Medure responded to the article in *US News*); Defs.' Ex. 33 (similar article in August 17, 1993 issue of *The Pittsburgh Post–Gazette*); Defs.' Ex. 35 (similar article in August 22, 1993 issue of *The Pittsburgh Post–Gazette*).

Finally, because the controversy in the article in question was about Plaintiff's management of the Shooting Star Casino, the allegedly defamatory statement about the termination of Gaming World was related to the public controversy, and therefore Defendants are entitled to the heightened protections described in *New York Times v. Sullivan. See N.Y. Times*, 60 F.Supp.2d at 486 (Medure's earlier experience with the Shooting Star Casino was relevant to the controversy as reported in the articles in that case).

Because Medure was a limited purpose public figure for purposes of the public controversy concerning his management of the Shooting Star Casino in the November 13, 1997 *Vindicator* article, he must demonstrate the existence of actual malice by the Defendants in order to recover damages. They contend that he has failed to do so. He argues that he presented sufficient evidence to create a genuine issue of material fact for the jury to resolve.

*Actual Malice*

"The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Rather, the phrase means that a plaintiff must demonstrate that a false statement was made "with knowledge that it was false or with reckless disregard for whether it was false or not." *New York Times*, 376 U.S. at 279–280, 84 S.Ct. 710; *Fitzpatrick v. Philadelphia Newspapers, Inc.*, 389 Pa.Super. 438, 567 A.2d 684, 688 (1989). In other

words, the standard is a subjective one: "The plaintiff must demonstrate that the author 'in fact entertained serious doubts as to the truth of his publication,' *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), or acted with a 'high degree of awareness of … probable falsity,' *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Such evidence can overcome a defendant's insistence that it acted in good faith and with the honest belief that the statement was true. *Schiavone*, 847 F.2d at 1090.

Defendants note that the Supreme Court has stated that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte–Hanks*, 491 U.S. at 685, 109 S.Ct. 2678 (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). However, the Court has also stated that "[t]he finder of fact must determine whether the publication was indeed made in good faith." *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323. Indeed, the *Harte–Hanks* case, like a number of other defamation cases, was decided on an appeal from a jury verdict after the district court denied the defendant's motion for summary judgment. 491 U.S. at 660–61, 109 S.Ct. 2678. *See Schiavone*, 847 F.2d at 1089 ("The district court found the question whether Time acted with *New York Times* actual malice to be appropriate for jury consideration and therefore refused to grant Time's summary judgment motion on that issue. We agree.")

Actual malice may be established through circumstantial evidence. *Herbert v. Lando*, 441 U.S. 153, 170, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). However, "[t]here

must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. It is the plaintiff's burden to demonstrate actual malice by clear and convincing evidence. *Bose,* 466 U.S. at 511 n. 30, 104 S.Ct. 1949. This is a difficult burden to meet, and it is not met by a showing of mere carelessness or negligence. *Curran v. Philadelphia Newspapers, Inc.,* 376 Pa.Super. 508, 546 A.2d 639, 645 (1988). When offered against a media defendant, a plaintiff's evidence of actual malice must indicate "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super. 588, 422 A.2d 625, 629 (1980) (quoting *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)).

For example, "[f]ailure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." *Fitzpatrick,* 567 A.2d at 688 (citing *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678). Similarly, "[a] defendant's failure to verify his facts may constitute negligence, but does not rise to the level of actual malice." *McDowell,* 769 F.2d at 951. Nor, without more, will a newspaper's motive in publishing a story. *Harte–Hanks,* 491 U.S. at 665, 109 S.Ct. 2678. An erroneous interpretation of the facts does not meet the standard. *Schiavone,* 847 F.2d at 1090 (citing *Time, Inc. v. Pape,* 401 U.S. 279, 292, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971)). It is well settled that "[a]ctual malice cannot be inferred solely because the information gathered by the reporter is presented in an ambiguous and potentially defamatory manner." *Brophy,* 422 A.2d at 633 (citing *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d, 495, 509 (3d Cir.1978)).

However, the Supreme Court has stated that:

> Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant,* 390 U.S. at 732, 88 S.Ct. 1323 (footnote omitted). In addition, a media defendant's purposeful avoidance of the truth may be evidence of actual malice. *Harte–Hanks,* 491 U.S. at 692, 109 S.Ct. 2678.

In *Schiavone,* the Court of Appeals held that the district court properly denied Time Magazine's motion for summary judgment with respect to the issue of actual malice. Time had reported that Ronald Schiavone and his construction company (SCC) had appeared on an FBI report concerning the disappearance of former Teamster boss Jimmy Hoffa (the "HOFFEX files"). However, at his deposition, the author of the article (Sandy Smith) admitted that the memorandum from FBI Director William Webster contained exculpatory language, namely that none of the references to Schiavone "suggested any criminality or organized crime associations." 847 F.2d at 1074. Smith testified that he omitted this exculpatory information because he did not believe it, based on other confidential information he had received. Smith made three attempts to corroborate his information, but all of them were unsuccessful.

The Court of Appeals identified three reasons for its belief that a jury could find

by clear and convincing evidence that the article was published with actual malice. First, a jury could find evidence of malice in the fact that four independent sources with good bases for knowledge contradicted the assertion that the names appeared in the HOFFEX files. Second, a jury could find that Smith's explanation of why he deleted the exculpatory clause created clear and convincing evidence of malice because he admitted that he found the entire Webster memorandum unreliable, but he used only the portions that were damaging to Schiavone, omitting the exculpatory clause.

Third, the court stated that:

Smith's decision to simply delete language that cast a very different and more benign light on the facts he reported, could itself serve as the basis for a jury's finding by clear and convincing evidence that Time acted with knowledge of probable falsity. Even assuming that a jury were to find that Time lacked actual malice in reporting that the name of Schiavone appeared in the HOFFEX files, the jury could nevertheless find by clear and convincing evidence that Time acted with actual malice based on its deletion of the exculpatory clause and its insinuation that the appearance of Schiavone and SCC in the HOFFEX files would have "intrigued" the Senate Committee and Special Prosecutor. The jury could find that Time's alteration implicitly recognized that the story would not "intrigue" its readers without this significant falsification. It could believe that Time recognized the damning implications, and emphasized them by omitting the exculpatory clause and adding editorial comment to draw attention. In other words, the jury could find clear and convincing evidence that Time's omission of the exculpatory clause significantly altered the message of the memorandum, that Time knew its

implication was false, and that Time intended that false implication.

*Id.* at 1092.

In *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309 (3d Cir.1994), The Virgin Islands Daily News published an article which stated that Gabriel St. Surin, the head of the Department of Public Works (DPW) engineering division, was the target of a federal prosecutor's investigation for trading favors for contracts and that he would be imminently subject to charges. However, the evidence indicated that the reporter who wrote the story (Abu Bakr) had spoken to the U.S. Attorney (James Hurd) about potential criminal charges from an investigation of improprieties at DPW and that Hurd confirmed the investigation but refused to state that charges would be filed. Bakr prepared a draft of the article that accurately reflected this information, but the Daily News editor (Penny Feuerzeig) changed it to read that the government expected to file charges against St. Surin the following week. The court noted that "[t]his change is material because it changes and intensifies the false 'sting.'" 21 F.3d at 1318.

The court stated that:

The Daily News argues it was negligent not reckless, but points to no evidence that could indicate any source for the mistake about what Hurd said. Feuerzeig may have told Bakr the information came from an additional source, but the only source this record shows is Bakr, and his testimony flatly contradicts the article's version of what Hurd said. While it might have been merely negligent to misattribute the quote, a fabrication of what Hurd said is enough to show "a high degree of awareness of ... probable falsity," or a reckless disregard for the truth.

*Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

Defendants cite the *Marcone* case, in which the Court of Appeals determined that the evidence presented at trial was not sufficient to sustain the jury verdict that two errors in a magazine article demonstrated the existence of actual malice. First, the article stated that Frank Marcone purchased $25,000 worth of marijuana when the fact was that although he was indicted, he was not convicted on this charge. The court noted that the magazine obtained this article from free-lance writer Edward Rasen, and there was evidence that Rasen was a very reliable professional reporter. Therefore, Penthouse could reasonably rely on Rasen's article and could not be held liable because it failed to investigate the issue further. 754 F.2d at 1089.

Second, the article falsely reported that charges against Marcone were withdrawn because of his cooperation with authorities, when the truth was that the charges were dismissed without prejudice so that he could be reindicted in Philadelphia. With respect to this error, the court noted that the source of the error was a Senate Subcommittee report that contained a footnote indicating that an individual named above Marcone in a list of individuals charged with drug crimes had his sentence reduced based on his cooperation. The court stated that:

> Footnote one, which refers only to Charles S. Hewett, indicates that Hewett cooperated with the government in order to receive a reduced sentence. All that is stated about Marcone is that his indictment was dismissed and that he was to be reindicted in Philadelphia. Someone at the magazine apparently misread the footnote as also referring to the individuals listed below Hewett, including Marcone, or somehow confused

the two men. Immediately below Marcone in the Penthouse article's list of "attorney criminals" is Hewett. With regard to Hewett, Penthouse correctly states that charges against him were dismissed because of cooperation with the government. The mistake regarding Marcone might be called unprofessional, even negligent, but it cannot be said to rise to the level of actual malice. *Id.* at 1090.

Defendants argue that the court's conclusion that the Plaintiff had now shown actual malice was based on the fact that the editors were unable to explain the source of the error. However, what the court stated was that this statement was not "so inherently improbable that Penthouse should have been put on notice of the probability of falseness." *Id.* at 1091. By contrast, in this case, a jury could conclude that, after Armstrong had written at least four articles in which she correctly stated that federal regulators had been asked to investigate Gaming World, she should have been on notice that the statement that the FBI was actually investigating Gaming World was probably false.

Defendants also cite *Reed v. Northwestern Publishing Co.*, 124 Ill.2d 495, 125 Ill.Dec. 316, 530 N.E.2d 474 (1988), a case in which a police officer brought suit against a newspaper for publishing the erroneous information that he had been implicated in a burglary ring. The court stated that, although the reporter (Carl Young) indicated that he probably read the grand jury report before writing his article

> he stated that he based the [allegedly libelous] statement on previous stories-stories which he had little, if any, role in writing. Considering testimony that Young relied on previous stories, and considering that the [grand jury] report itself is extremely murky in its discussion of numerous officers, including Mi-

chael Reed (so that unless one scrutinizes the report one could well conclude that Reed had been "implicated"), we agree with the circuit court that a jury could not find "clear and convincing" evidence that Carl Young had "a high degree of awareness" of the probable falsity of his articles.

*Id.*, 530 N.E.2d at 482.

By contrast, in this case, Armstrong wrote all of the previous articles that had correctly stated that federal regulators had been asked to investigate Gaming World, and the original AP dispatch was not "murky." Rather, this case is similar to the *St. Surin* case, because the Defendants are arguing that Plaintiff's evidence amounts to a claim that Armstrong negligently used the word "FBI" instead of the phrase "federal regulators" and that she failed to investigate whether her statement was true, and therefore they contend that he has not proffered clear and convincing evidence that they acted with actual malice. Although it is true that a failure to investigate cannot itself constitute evidence of actual malice, when a newspaper changes the words of a story and thereby casts the plaintiff in a different light, these actions can be considered by the jury as evidence of actual malice. Armstrong changed the words of the story so that, instead of stating that the tribe had asked federal regulators to investigate the situation, the article stated that the FBI was actually investigating Gaming World.

There is a genuine issue of material fact with respect to the issue of whether Armstrong's affirmative act of changing the words of the story is sufficient to overcome her statement that, at the time she wrote the article, she did not actually entertain serious doubts about its truth or accuracy. It is for the trier of fact to consider all of the evidence and determine this issue. Therefore, with respect to this argument, the motion for summary judgment filed by Defendants should be denied.

### Burden of Proof of Falsity

The Supreme Court has also addressed the burden of proof of truth or falsity in a defamation case. A public figure plaintiff bears the burden of showing that the statements at issue are false. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Ertel v. Patriot-News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996). In addition, when "the plaintiff is a private figure and the newspaper articles are of public concern ... the common law's rule on falsity-that the defendant must bear the burden of proving truth-must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages." *Id.* at 776, 106 S.Ct. 1558.

### Choice of Law

The parties have mentioned, but not addressed, the choice of law question. Defendants note that it might be the law of either Ohio or Pennsylvania that might apply, although they state without elaboration that "strong arguments exist for applying only Ohio law." (Defs.' Br. at 44 n.22.) Plaintiff's brief cites only Pennsylvania cases, but does not discuss the choice of law issue.

The Restatement 2d of Conflict of Laws § 150(2) states that: "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." Medure is a Pennsylvania resident. (Medure Dep. at 7.) He testified that he read the article in an issue of *The Vindicator* that he purchased in New Castle, Pennsylvania. (Medure Dep. at 109–10, 112.) Mr. Paglia stated that the article ran on the front

page of the Pennsylvania edition of *The Vindicator*, and therefore it appeared in 3600 newspapers, but he also thought that it had appeared in all of the other editions, for a total of 90,000 newspapers. (Paglia Dep. at 17–18.) Thus, the harm to Medure's reputation would have occurred primarily in Pennsylvania.

Because the matter was published in Pennsylvania and caused harm to Plaintiff's reputation primarily in Pennsylvania, the law of Pennsylvania should apply. *See Marcone*, 754 F.2d at 1077 ("Inasmuch as Marcone is a Pennsylvania resident and any harm to his reputation that may have occurred centered in that state, the district court was correct to apply Pennsylvania law.") In the *NY Times* case, Judge Cohill adopted Magistrate Judge Caiazza's determination that Pennsylvania law applied even though the defendants were publishing companies located in New York and California and the offending statements had appeared in a California newspaper. 60 F.Supp.2d at 483. Therefore, Pennsylvania law will be applied.

Defendants contend that all libel plaintiffs bear the burden of demonstrating that an allegedly defamatory statement is false. (Defs.' Br. at 25.) As the cases described above hold, however, that is not an accurate summary of the law. Under Pennsylvania law, for example, if Medure was not a limited purpose public figure, or if the speech did not involve a matter of public concern, Defendants would bear the burden of demonstrating the truth of the allegedly defamatory statement. 42 Pa.C.S. § 8343(b)(1).

However, for the reasons discussed above, Medure was a limited purpose public figure for purposes of the controversy involving his management of the Shooting Star Casino as discussed in the November 13, 1997 article in *The Vindicator*. Moreover, even if he were not a limited purpose public figure, the management contract between Gaming World and the Shooting Star Casino, including the termination of this contract, was an issue of public concern. Therefore, the constitutional concerns of *Hepps* are implicated, and Plaintiff bears the burden of demonstrating that the statement was false.

*Was the Statement Substantially True?*

Defendants have admitted, by way of the apology issued on April 19, 1998, that they had no evidence that Gaming World was under investigation by the FBI on allegations of skimming $22 million from the casino at the time the article was published. Moreover, Armstrong admitted that her reference to the FBI in the November 13, 1997 article was a mistake. She has stated that she copied the passage used in the November 13 article from the November 8 article, and that the November 8 article was a mistake because it substituted the FBI for federal regulators. (Armstrong Decl. ¶¶ 7–8.) Senior Regional Editor Anthony Paglia and Managing Editor Paul Jagnow have also referred to the reference to the FBI as "a mistake." (Paglia Dep. at 7, 29–30, 38–39, 46; Jagnow Dep. at 22–23, 57, 61.)

Defendants now argue that the statement was "substantially true" because FBI and federal regulators are similar and because there is no significant distinction between being under investigation and being under consideration for investigation. They also note that the article did not reveal the harsh words of the actual tribal resolution. Finally, they argue that there is evidence that Gaming World was under investigation by the FBI. Plaintiff responds that: 1) there is a significant difference between reporting what some members of the tribe alleged and reporting that an investigation by the FBI was underway; and 2) Defendants' references to an FBI investigation are not related to the alleged investigation reported in the article, but rather to a background check

performed before Gaming World began managing the casino, the FBI investigation into alleged connections with organized crime that was the subject of the *US News* article, and the indictment and conviction of three members of the tribal council which did not involve Medure or Gaming World in any way.

*Differences Between Article and AP Wire*

Defendants argue that the article was substantially true because there is no significant difference between the phrase "federal regulators" (used in the AP wire) and the word FBI (used in the article), and because there is no significant difference between saying that a governmental agency was investigating Gaming World and saying that the agency was considering whether to investigate Gaming World.

Defendants cite an unpublished district court opinion in which a district court held that an article which reported that the plaintiff had been arrested by the FBI was substantially accurate because he had really been arrested by state police. *Robinson v. U.S. News & World Report, Inc.*, No. 88 C 7260, 1989 WL 55021 (N.D.Ill. May 11, 1989) (Defs.' Ex. 21). That case is distinguishable from this one. A far more relevant case is *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309 (3d Cir.1994), cited above. In that case, false statements were made in newspaper articles that St. Surin, the head of the DPW engineering division, was the target of a federal prosecutor's investigation for trading favors for contracts and would be imminently subject to charges. The Court of Appeals rejected the argument that these statements were "substantially true" because the Environmental Protection Agency had proposed filing administrative sanctions against him. The court held that the district court had erred by granting summary judgment for the defendants. *Id.* at 1316–17.

Defendants also argue that, if anything, the article (which used the word "skimming") was mild by comparison to the harsh words of the actual tribal resolution, which contained allegations of "pillaging, looting and purloining." (Defs.' Ex. 5.) However, they have mischaracterized the situation. Although the tribal resolution contained allegations of wrongdoing against Medure and Gaming World by members of the *tribe*, the article went farther by stating that the *FBI* was investigating the company. "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Williams v. WCAU–TV*, 555 F.Supp. 198, 202 (E.D.Pa.1983). "Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (quotation omitted).

The gist of the tribal resolution was that allegations of wrongdoing by Medure and Gaming World had been made and federal regulators had been asked to investigate. By contrast, the gist of the article in *The Vindicator* could have been understood to say that the FBI was actively investigating Gaming World.

Plaintiff has submitted testimony by individuals that the statement in the article that Gaming World was under investigation by the FBI was significant to them. (LaGrotta Dep. at 74, 79, 106, 111–12; Antonio Dep. at 22; Lamancusa Dep. at 76–77.) There is a genuine issue of material fact as to whether people reading the article in *The Vindicator* would have taken from it the same gist and whether it had the same sting as a report about the tribal council's resolution.

*Was There an FBI Investigation?*

Armstrong states that, while covering the trial, she

was aware that the challenged U.S. News article had reported that the FBI was investigating Medure, and [she] heard the name "FBI" on numerous occasions during the trial. [She] does not recall any evidence at trial showing that the FBI investigation described in the U.S. News article had not occurred, nor does [she] recall counsel arguing in court during the trial that the FBI investigation described in the U.S. News article had not occurred.

(Armstrong Decl. ¶ 6.) However, in her deposition, she stated that she did not hear any testimony about an FBI investigation during the trial. (Armstrong Dep. at 129–31.) The Court of Appeals has held that where "a party contradicts, without satisfactory explanation, his or her prior testimony . . . the objectives of summary judgment would be seriously impaired if the district court were not free to disregard the conflicting affidavit." *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988).

Defendants argue that Armstrong's declaration does not conflict with her deposition testimony because, at her deposition, she was asked only if there was "testimony" about an FBI investigation, whereas in her declaration, she states that she heard the word "FBI." (Defs.' Reply Br. at 14.) However, in her deposition, she testified that "I don't recall [the issue of an FBI investigation] being discussed, whether it was or it being decided whether there was or wasn't one." (Armstrong Dep. at 130.) Defendants cannot meet their burden on a motion for summary judgment by submitting a declaration by Armstrong which contradicts her deposition testimony.

Defendants also cite portions of the testimony in the *US News* case, and they have submitted the transcript of an interview with Henry Zottola conducted by James Popkin for *US News.* (Defs.' Exs. 13–16.) They have not explained, however, how the article at issue in that case (written in 1993) concerning an alleged FBI investigation into Medure's possible involvement with organized crime figures, supports the statement that Gaming World was placed under FBI investigation for skimming $22 million from the casino, made in November 1997 relating to events that occurred in 1996.

Defendants point to testimony by three individuals to support their contention that the statement in the article was substantially true because an FBI investigation did take place. Stephen Exley was an outside auditor hired by the tribe in July 1996. He stated that he was told by a federal investigator to expect inquiries from the FBI, although he did not recall the details of the FBI inquiry and remembered only one brief phone call from a man who identified himself as being from the FBI but he could not recall what the call was about. (Exley Dep. at 8). Defendants refer to testimony by Exley that he was contacted by other federal agents, such as agents of the Bureau of Indian Affairs and the IRS concerning the diversion of cash from the Casino to Mr. Medure (Exley Dep. at 28–29, 56–57). This testimony clearly does not establish that Plaintiff was being investigated by the FBI.

Elizabeth Foster–Anderson was a former accountant for the casino (Foster–Anderson Dep. at 8). She stated that she was questioned by David Barnes who worked for the FBI or the Inspector General's office and by "Mike" Balen, an investigator in the Attorney General's office.[4]

4. Plaintiff identifies Balen as an FBI agent. (Medure Dep. at 100–103.)

She testified that all of the employees of Gaming World International that were in senior management positions were under investigation. That included Mr. Medure and her. (Foster Anderson Dep. at 22–23, 29). However it is noted that although she could testify that she was questioned by a person who told her he was either an FBI agent or a representative of the Inspector General's office, she is not qualified to testify that the FBI conducted an investigations or the scope of it.

Frank Johnson is a CPA who worked for the tribe. He had been interviewed twice by the FBI about Medure. The last one occurred in October 1999. (Johnson Dep. at 8, 27–28, 29, 51–52). They asked him about Plaintiff's salary coming out of the Shooting Star revenue and the reimbursements given to Gaming World International. This testimony does not establish that the statement in the article that Plaintiff was under investigation by the FBI was substantially true.

None of this testimony cited by Defendants demonstrates that the statement that Gaming World was under investigation by the FBI in August 1996 was substantially true. Finally, Defendants argue that

> Even Medure admits the existence of a federal investigation of the payment of casino money to Gaming World, quibbling only with whether Gaming World had actually done anything wrong. Medure states: "[T]he financial arrangement between Gaming World, the Shooting Star and the Tribe had previously been examined by the Department of the Interior and the FBI just a few years previously, and no improprieties were found relating to Gaming World." (Pltff's Brief at 27.) The Vindicator did not report that the FBI or any other federal agency found any improprieties,

only that there was an investigation, which Medure effectively admits. (Defs.' Reply Br. at 17.)

The reference in Plaintiff's brief is to a *previous* FBI investigation that ended in a conclusion of "no improprieties," not an investigation in connection with the firing of Gaming World for managing the Shooting Star Casino and accusation of "skimming $22 million."

In summary, none of the citations to the record made by the Defendants establishes that the FBI was investigating allegations that Gaming World had skimmed $22 million from the casino. The record reveals there are genuine issues as to the material facts as to whether the article was substantially true. Therefore, with respect to this argument, the motion for summary judgment filed by Defendants should be denied.

*Fair Report Privilege*

Defendants argue that the fair report privilege protects the article. "The fair report privilege ... developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer." *Medico v. Time, Inc.*, 643 F.2d 134, 137 (3d Cir.1981) (footnote omitted). The Court of Appeals described the privilege as the ability of "the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own." *Id.* at 137–38 (footnotes omitted). "The existence and breadth of the privilege concerning reports of official or judicial proceedings are matters of law appropriate for summary disposition." *Friedman v. Israel Labour Party*, 957 F.Supp. 701, 709 (E.D.Pa.1997).

Defendants rely upon the *Friedman* case, in which newspapers published a press release issued by the Israeli government that Howard Friedman and six others were barred from entering the state of Israel because they either had a criminal background which might endanger public peace or were liable to endanger state security. The court held that the publication of this press release fell within the fair report privilege because the policy justifications for the privilege (supervisory interest of the press to inform the public about the workings of governments, the informational interest in education, and the agency rationale by which the reporter acts as agent for those who could inform themselves) were satisfied. *Id.* at 711–13.

Defendants argue that a resolution by an Indian tribe similarly falls within the privilege. *Friedman* was a case of first impression. In his seminal treatise on the subject of defamation, Judge Sack notes that "[c]ase law as to whether reports of the proceedings of foreign courts and other agencies fall within the privilege is sparse and contradictory." 1 *Sack on Defamation* § 7.3.2, at 7–22 to 7–23 (3d ed.1999). *See Lee v. Dong–A Ilbo*, 849 F.2d 876 (4th Cir.1988) (the press release of two South Korean intelligence agencies reporting the involvement of a South Korean citizen-New York resident in a North Korean spy ring and six newspapers' republication of that release were not covered by the fair report privilege), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989). There is no reported case discussing whether the privilege would extend to the resolution of an Indian tribe, although it would appear that it would because the tribe would be recognized as a sovereign government.

Plaintiff's evidence that Armstrong admitted that she had not seen the tribal resolution when she wrote the article in question, (Armstrong Dep. at 136–42), does not help Plaintiff because the court in *Medico* noted that a media defendant need not actually have seen and relied upon reports of official proceedings so long as the story is a fair and accurate portrayal of the events in question. 643 F.2d at 146–47 (citing *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 275 A.2d 53, 58 (1971)).

However, the Court need not resolve the difficult question of the applicability of the fair report privilege in this case because, even assuming that the resolution of an Indian tribe falls within the privilege, there is an issue of fact as to whether the article gave a fair and substantially accurate statement of it. Rather, the article stated that Plaintiff was being investigated by the FBI while the Resolution stated that it was hoped that Plaintiff and Gaming World would be investigated by state and federal officials. The privilege is a qualified one, and it "is forfeited if the publisher steps out of the scope of the privilege or abuses the 'occasion.' This can be done by exaggerated additions, or embellishments to the account." *Sciandra v. Lynett*, 409 Pa. 595, 187 A.2d 586, 589 (1963). "Although it is a question of law as to whether or not [a] conditional privilege applies, it is a question of fact as to whether or not that privilege has been abused." *Simms v. Exeter Architectural Prods., Inc.*, 916 F.Supp. 432, 436 (M.D.Pa. 1996). Under Pennsylvania law, the burden to demonstrate abuse of a conditional privilege in a defamation case falls on the plaintiff. 42 Pa.C.S. § 8343(a)(7). *See Computer Aid, Inc. v. Hewlett–Packard Co.*, 56 F.Supp.2d 526, 534 (E.D.Pa.1999) (the court denied a computer manufacturer's motion for summary judgment when genuine issues of material fact existed as to whether a contractor's press release was a fair and accurate report of the complain the contractor had filed). Plaintiff has demonstrated the existence of a genuine issue of material fact as to whether

Defendants abused the privilege. Therefore, with respect to this argument, the motion for summary judgment filed by Defendants should be denied.

### Wire Service Privilege

Defendants argue that the passage in Armstrong's article was based upon a passage in an AP wire issued on August 14, 1996, and that it is therefore protected by the "wire service privilege." "Under the 'wire service' defense, republication of a news article published by a recognizable and reliable source of daily news cannot constitute defamation, unless the story was reproduced in a negligent manner." *Friedman,* 957 F.Supp. at 715 n. 21.

Plaintiff asserts that Pennsylvania has never adopted this privilege. In *Friedman,* the court stated that "the wire service defense is currently unavailable under Pennsylvania law." *Id.* Defendants argue that this statement in *Friedman* is dictum. However, they have cited no authority for their argument that the privilege is available under Pennsylvania law.

### Of and Concerning Plaintiff

For a statement to be actionable by a plaintiff, it must be shown that the allegedly defamatory statement was "of and concerning" the plaintiff. *New York Times Co. v. Sullivan,* 376 U.S. 254, 267, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). "Whether the complaint alleges facts sufficient reasonably to connect the libel to the plaintiff is a question for the court, although the ultimate determination of whether the libel actually applies to the plaintiff is for the jury." 1 *Sack on Defamation* § 2.9.3, at 2–120. *See* Restatement (Second) of Torts § 617.

Defendants contend that the statement was not of and concerning Medure because it was about Gaming World. Although he is the president of Gaming World, they argue that he is not "the company." They cite an unpublished opinion in *American Benefits Corp. v. Administrative Consul-*

*tants, Inc.,* a case in which the president and the chief executive officer (the Generalis) of a company (ACI) brought a defamation claim based on a letter stating that ACI "does not have the necessary financing for" a project, that "the entire program is in danger of failing" and that "ACI is small, basically unprofitable company." No. 87 CIV. 1797(JFK), 1989 WL 129495, at *8 (S.D.N.Y. Oct. 26, 1989). The court held that the Generalis failed to demonstrate that the defamatory statements were "of and concerning" them because the "remarks were made 'of and concerning' ACI. The Generalis are not mentioned at all. In this case, then, the Generalis cannot recover unless the alleged defamatory matter imputes to them 'personal misconduct or reprehensible character.'" *Id.* at *10. Defendants also cite a case in which two individuals brought a libel action against a newspaper concerning a housing project and the Pennsylvania Supreme Court parenthetically noted, with respect to a separate action brought by the housing association for articles criticizing the physical condition of the housing premises, that "[w]ords criticizing a corporation, without more, are not defamatory of a person connected with it." *Volomino v. Messenger Publ'g Co.,* 410 Pa. 611, 189 A.2d 873, 874 n. 1 (1963).

In this case, however, Medure was mentioned by name and identified as the owner of Gaming World. In addition, Plaintiff has submitted testimony from individuals in the community that the statement was understood by them to reflect on him. (Antonio Dep. at 38–40; LaGue Dep. at 76–77; Lamancusa Dep. at 75–78; LaGrotta Dep. at 25, 62.) This is sufficient to create a genuine issue of material fact to be decided by the jury. *See Dalbec v. Gentleman's Companion, Inc.,* 828 F.2d 921, 925 (2d Cir.1987). Therefore, with respect to this argument, the motion for

summary judgment filed by Defendants should be denied.

In conclusion, it is recommended that the Motion for Summary Judgment filed by Defendants be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights. Dated: Nov. 30, 2000.